680 So.2d 159 (1996)
HASPEL & DAVIS MILLING & PLANTING CO. LTD., et al.
v.
BOARD OF LEVEE COMMISSIONERS OF THE ORLEANS LEVEE DISTRICT.
No. 95-CA-0233.
Court of Appeal of Louisiana, Fourth Circuit.
September 4, 1996.
Writ Denied December 6, 1996.
*161 Baldwin & Haspel, Conrad Meyer, III, Malcolm A. Meyer, Dennis M. Laborde, New Orleans, for Plaintiffs-Appellants.
Uddo & Milazzo, Frank J. Uddo, Basile J. Uddo, Anthony J. Milazzo, Metairie, Middleberg Riddle & Gianna, Dominic J. Gianna, Paul J. Mirabile, Ronald J. Vega, Emile W. Schneider, New Orleans, for Defendant-Appellee.
Before BARRY, KLEES and WALTZER, JJ.
BARRY, Judge.
On February 22, 1988 Haspel & Davis Milling & Planting Co., Ltd., Bohemia Planting Co., Inc., Jean Connell, Joseph Torre, Leonie Rothschild, Arthur Davis, on behalf of themselves and all other persons similarly situated, the former owners of property expropriated as part of the Bohemia Spillway or their successors, filed a class action against the Board of Levee Commissioners of the Orleans Levee District. They sought: a declaratory judgment decreeing that title to mineral and other royalties vested with the original owners or their successors as of the effective date of Act 233 of 1984 (June 29, 1984), that the Levee Board had no right to the use of those revenues, and that the Levee Board was required to turn over the royalties earned from June 29, 1984 to successful claimants under Act 233; preliminary and permanent injunctions ordering the Levee Board to put in escrow with the clerk of court and segregate all funds from those mineral interests. In a 1992 first amended petition filed in 1992 a number of plaintiffs were added and a due process violation was alleged. The plaintiffs additionally sought an accounting for all revenues derived from lands after that date, a determination of each plaintiff's share of the royalties collected, the amount of the royalties collected from June 29, 1984, judicial interest from that date, and certification of the class. In a 1994 second supplemental petition there were changes in the plaintiffs who alleged that the Levee Board had a fiduciary duty to the landowners, which had been breached, and the plaintiffs sought reimbursement for any mismanagement by the Levee Board.
The Levee Board had filed a number of exceptions including a no cause of action exception. The trial court maintained the no cause of action exception as to revenues generated between the effective date of Act 233 of 1984 and the various dates when title to the lands were transferred to the plaintiffs and dismissed with prejudice those claims (since plaintiffs could not amend to state a cause of action).[1] To the extent that the suit sought revenues generated after the dates of transfer, the claims were not dismissed. As to the new claims raised in the second supplemental petition relating to the Board's fiduciary duty, the exception was maintained, but plaintiffs were allowed 15 days to amend. The other exceptions were dismissed as moot except for the improper venue exception which was overruled in a separate order. According to the transcript, the trial court concluded that Act 233 did not transfer ownership because there are no words clearly evidencing that intent.
In a third supplemental petition the plaintiffs clarified the fiduciary duty argument and claimed an equal protection violation in the method of returning the property. In a fourth supplemental petition the plaintiffs alleged that the Board's continued collection of revenues after June 29, 1984 was a taking or an inverse condemnation and requested costs and attorney's fees.
The trial court denied a motion for new trial on the judgment relating to exceptions and dismissed all claims raised by pleadings *162 including the fourth supplemental petition except for claims for monies received after the dates of deeds transferring property to plaintiffs and gave lengthy reasons.
The plaintiffs appeal the judgments maintaining the exception and denying the motion for a new trial. The denial of a motion for a new trial is not an appealable judgment absent a showing of irreparable harm. La. C.C.P. art.2083; Masson v. Champion Insurance Company, 591 So.2d 399 (La.App. 4th Cir.1991). However, when a non-appealable issue is raised in conjunction with appealable issues such as the judgment maintaining the no cause of action exception, the non-appealable issues may be reviewed to achieve judicial economy and justice. Martin v. Martin, 95-0466 (La.App. 4 Cir. 10/26/95), 663 So.2d 519.

HISTORY
Pursuant to 1924 La. Acts, No. 99, § 2, the Orleans Parish Levee Board expropriated 33,000 acres of land known as the Bohemia Spillway in 1924-1926 to create a naturally operating spillway which would protect the city of New Orleans from high water in the Mississippi River. Article VII, § 14(A) of the 1974 Constitution prohibited the pledging or donating of property of the state or any political subdivision, but amendments to § 14(B) in 1983 set forth an exception for:
(4) the return of property, including mineral rights, to a former owner from whom the property had previously been expropriated, or purchased under threat of expropriation, when the legislature by law declares that the public and necessary purpose which originally supported the expropriation has ceased to exist and orders the return of the property to the former owner under such terms and conditions as specified by the legislature....
The legislature then passed Act 233 of 1984 (effective June 29, 1984), which provides:
Section 1. Pursuant to authority of Louisiana Constitution Article VII, Section 14(B), the Legislature of Louisiana hereby declares that the public and necessary purpose set forth in Act No. 99 of 1924, which may have originally supported the expropriation of property, or any right of ownership thereto, on the east bank of the Mississippi River in the parish of Plaquemines for the construction of a spillway, known as the Bohemia Spillway, has ceased to exist insofar as it ever may have affected the ownership of property, including mineral rights. The Legislature of Louisiana hereby orders the Board of Levee Commissioners of the Orleans Levee District, the board, to return the ownership of said property to the owners or their successors from whom the property was acquired by expropriation or by purchase under threat of expropriation. Neither the provisions of this Act nor any actions pursuant to this Act shall affect the title to land which was the subject of litigation on the effective date of this Act.
Section 2. The secretary of the Department of Natural Resources shall have rule making and procedure making authority consistent with the Administrative Procedure Act, R.S. 49:950, et seq., for the purpose of establishing procedures and guidelines for the receipt and evaluation of applications, notification of applicants, review of denials by hearings, relaxation of technical rules of evidence, settlement and distribution of funds for successful application, and any other rules and procedures reasonably necessary for the orderly implementation of the return ordered herein. The secretary shall proceed immediately upon the effective date of this Act with steps necessary for the development and adoption of rules and procedures to begin the implementation of the provisions of this Act by January 1, 1985.
Section 3. The Board of Levee Commissioners of the Orleans Levee District shall provide a thorough accounting to the secretary of the Department of Natural Resources, or his designee, concerning all revenues received from the affected property. The information so provided shall be made available to applicants. The board shall comply with the spirit and letter of the rules and regulations adopted and promulgated by the secretary of the Department of Natural Resources.

*163 Section 4. The secretary of the Department of Natural Resources shall begin steps by January 1, 1985, to notify affected persons.
Section 5. The return of property by the board to the owners or their successors shall be subject to all servitudes and rights-of-way, whether acquired by expropriation or otherwise, or surface or mineral leases, or other valid contracts executed by or with the board prior to the effective date of this Act. Any deed whereby any property is returned shall state that such property is subject to such rights. Any party to a contract in effect on the effective date of this Act with the board concerning property affected by this Act shall be entitled to make payments and give all notices required or permitted under such contract to the secretary until the title to the property affected has been transferred. When such contracts provide for renegotiation of rent between any person and the board, or provide that any person may seek approval by the board, such person shall be entitled to renegotiate such rent or to seek and obtain such approval from the secretary until the title to the property affected has been transferred. Any sum deposited with the secretary pursuant to this Act which represents rent, royalty or other sum attributable to land being returned, shall be paid by the secretary to the appropriate persons.
Section 6. This Act shall become effective upon signature by the governor or, if not signed by the governor, upon expiration of the time for bills to become law without signature by the governor, as provided in Article III, Section 18 of the Constitution of Louisiana.
Approved by the Governor: June 28, 1984.
The Louisiana Supreme Court upheld the constitutionality of Act 233 against the Levee Board's attack. Board of Commissioners of Orleans Levee District Department of Natural Resources, 483 So.2d 958 (La.1986), on rehear'g, 496 So.2d 281 (La.1986). The Levee Board also attacked Act 233 in federal court. See Board of Levee Commissioners of Orleans Levee Board v. Huls, 852 F.2d 140 (5th Cir.1988).
Act 819 of 1985 amended Sections 2, 4, 5 of Act 233 to provide:
Section 1. Sections 2,4, and 5 of Act 233 of the 1984 Regular Session are hereby amended and reenacted to read as follows:
Section 2. The secretary of the Department of Natural Resources shall have rulemaking and procedure making authority consistent with the Administrative Procedure Act, R.S. 49:950, et seq., for the purpose of establishing procedures and guidelines for the receipt and evaluation of applications, notification of applicants, submission of evidence as to applicants' rights to property within the Bohemia Spillway, certification of applications, in whole or part, and any other rules and procedures reasonably necessary for the orderly implementation of the return ordered herein. The secretary shall proceed immediately upon the effective date of this Act with steps necessary for the development and adoption of rules and procedures to begin the implementation of the provisions of this Act by January 1, 1985.
* * *
Section 4. The secretary of the Department of Natural Resources shall certify, in writing, to the board valid applications in accordance with the regulations to be adopted hereunder. The board shall, within sixty days of the receipt of a certification from the secretary, take action to return the ownership to persons or corporations certified as owners or successors to owners from whom the property was acquired by expropriation or by purchase under threat of expropriation. The secretary and any applicant, whose claims were the subject of the secretary's certification, shall be notified in writing of the board's action. Any applicant who is aggrieved by the board's action on the secretary's certification may seek judicial review of the board's action by filing suit in the Twenty Fifth Judicial District Court within thirty days of receipt of the written notice provided herein.
Section 5. The return of property by the board to the owners or their successors shall be subject to all servitudes and *164 rights-of-way, whether acquired by expropriation or otherwise, or surface or mineral leases, or other valid contracts executed by or with the board prior to the board's action taken pursuant to Section 4 of this Act. Any deed whereby any property is returned shall state that such property is subject to such rights.
Section 2.[sic] This Act shall become effective upon signature by the governor or, if not signed by the governor, upon expiration of the time for bills to become law without signature by the governor, as provided in Article III, Section 18 of the Constitution of Louisiana.
Approved by the Governor: July 22, 1985.
Act 847 of 1992 amended and reenacted Section 1 of Act 233 of 1984:
Pursuant to authority of Louisiana Constitution Article VII, Section 14(B), the Legislature of Louisiana hereby declares that the public and necessary purpose set forth in Act 99 of 1924, which may have originally supported the expropriation of property, or any right of ownership thereto, on the east bank of the Mississippi River in the parish of Plaquemines for the construction of a spillway known as the Bohemia Spillway, has ceased to exist insofar as it ever may have affected the ownership of property, including mineral rights. The Legislature of Louisiana hereby orders the Board of Levee Commissioners of the Orleans Levee District, the board, to return the ownership of said property to the owners or their successors from whom the property was acquired by expropriation or by purchase under threat of expropriation, act of convenience, or otherwise, including but not limited to sale or transfer subsequent to an adjudication for the nonpayment of taxes.
According to the May 16, 1988 affidavit of DNR Secretary Raymond Stephens attached as an exhibit to the Levee Board's exceptions, the DNR began implementation of Act 233 in February, 1985 by making available to the public the application forms. However, the Levee Board obtained a restraining order in March, 1985 from a district court which held the act unconstitutional. By the time the case went to the Louisiana Supreme Court on rehearing, it was 1986. The DNR posted notice in the Times Picayune on February 3, 1987 and made applications beginning March 8, 1987. Rules to evaluate the individual applications were promulgated on October 20, 1987.

JURISPRUDENCE
The purpose of the exception of no cause of action is to determine the legal sufficiency of the petition. The exception is triable on the face of the petition and well-pleaded facts of the petition must be accepted as true. The burden is on the exceptor. In reviewing a trial court's ruling on the exception, the appellate court should conduct a de novo review. A petition should not be dismissed for failure to state a cause of action unless it appears beyond a doubt that the plaintiff cannot prove facts in support of any claim which would entitle relief. "The question therefore is whether in the light most favorable to plaintiff, and with every doubt resolved in his behalf, the petition states any valid cause of action for relief." City of New Orleans v. Board of Commissioners of Orleans Levee District, 93-0690 (La.7/5/94), 640 So.2d 237, 253. See also Edgecombe, 650 So.2d at 1250-51.
When the law is clear and unambiguous and its application does not result in absurd consequences, it shall be applied as written and no interpretation may be made in search of the legislature's intent. La.C.C. art. 9; Daigrepont v. Louisiana State Racing Commission, 95-0539 (La.App. 4 Cir. 10/2/96), 663 So.2d 840, writ denied, 95-2828 (La.2/2/96), 666 So.2d 1085. When a statute is clear the court must give credence to the mandate expressed by the legislature and cannot resort to construing a statute based on the spirit of the law as opposed to the plain wording of the law. Longman v. Allstate Insurance Company, 93-0352 (La.App. 4 Cir. 3/29/94), 635 So.2d 343. A statute shall be construed to give meaning to the plain language of the statute. State, Department of Transportation and Development v. Walker, 95-0185 (La.6/30/95), 658 So.2d 190.
Courts should avoid a construction which would lead to absurd results. Statutes *165 must be interpreted in such a manner as to render their meaning rational, sensible and logical. State Through Department of Public Safety and Corrections, Office of State Police, Riverboat Gaming Division v. Louisiana Riverboat Gaming Commission and Horseshoe Entertainment, 94-1872 (La.5/22/95), 655 So.2d 292. Words and phrases shall be read within their context and shall be construed according to common and approved usage. La.R.S. 1:3. Inter Urban Bar Association of New Orleans, Inc. v. City of New Orleans, 93-1006 (La.App. 4 Cir. 3/16/95), 652 So.2d 1038. The law requires a fair and genuine construction of a legislative act, a reasonable construction in light of the act's purpose. Louisiana Health Service & Indemnity Company v. Tarver, 93-2449 (La.4/11/94), 635 So.2d 1090.
If the legislative language is unclear it must be interpreted according to the meaning that best conforms to the purpose of the law. The paramount consideration is ascertaining the legislative intent and reasons that prompted the legislature to enact the law. La.C.C. art. 10; Garrett v. Seventh Ward General Hospital, 95-0017 (La.9/25/95), 660 So.2d 841. See also 3 Sutherland on Statutory Construction § 58.01 (5th ed.1993). When the wording is susceptible to different meanings it is necessary to ascertain legislative intent. The title or preamble of the act may be used to determine legislative intent. Matter of American Waste and Pollution Control Company, 93-3163 (La.9/15/94), 642 So.2d 1258. When the literal construction of a statute produces unreasonable results, the letter must give way to the spirit of the law and the act must be construed to produce a reasonable result. To ascertain the true meaning of a word, phrase or section, the act as a whole must be considered. Green v. Louisiana Underwriters Insurance Company, 571 So.2d 610 (La. 1990). Unjust results should be avoided and if possible statutes should be construed to apply equally to all persons similarly situated. Guste ex rel. Courville v. Burris, 427 So.2d 1178 (La.1983).
Repeals by implication are not favored in the law. The legislature is presumed to intend to achieve a consistent body of law. Roby v. Board of Trustees of Employees' Retirement System of City of New Orleans, 94-0671 (La.App. 4 Cir. 1/31/96), 650 So.2d 811. When proposed legislation conflicts with existing law, the conflict should not be left to resolution by the courts. Wherever possible, conflicting sections of the prior statute should be identified by specific reference and expressly repealed. 1A Sutherland on Statutory Construction § 20.25 (5th ed.1993). The problem of determining the extent to which existing legislation is repealed by a subsequent act ultimately involves a consideration of statutory construction. A court should give a harmonious effect to all acts on a subject when reasonably possible. However, that is not possible when two acts are clearly irreconcilable and repugnant as to essential matters relating to the acts and are so inconsistent that they cannot operate concurrently. State v. Piazza, 596 So.2d 817 (La.1992), reh'g granted in part, 91-2256 (La.4/30/92). To determine whether a repeal has been effectuated the court must consider the environment, association and character of the legislation in its field of operation, the history of previous legislation, the legislative history of the amending or repealing act, and the nature of the defect sought to be remedied. Sutherland at § 23.06. Those provisions of an earlier act or section which are irreconcilable with provisions of an amendatory act are impliedly repealed. All matter that is omitted in the amended act is considered repealed. Id. at § 23.12.

ARGUMENT AND ANALYSIS
The plaintiffs argue that the trial court misinterpreted Act 233 of 1984 and Act 819 of 1985 and failed to consider that the four year delay in the transfer of the deeds greatly benefited the Levee Board. They contend that Act 819 did not repeal those provisions of Act 233 which intended that the plaintiffs should receive the revenues from the lands returned to them as of June 29, 1984 and the Levee Board's continued collection of revenues after the legislature declared that the public and necessary purpose ceased was an inverse condemnation or a taking in violation of due process and equal *166 protection. They argue that the Board was a fiduciary after the effective date of Act 233 and not entitled to the revenues generated by the lands. The Levee Board counters that ownership of the lands and revenues did not transfer to the former owners and their heirs until different dates in 1991 and 1992 when title was transferred by the Board to each individual pursuant to Act 233 of 1984 as amended by Act 819 of 1985 and Act 847 of 1992.
In lengthy reasons for denying the plaintiffs' motion for new trial, the trial court concluded that Act 233 of 1984 was not self-implementing because DNR was directed to establish procedures to implement the return of the land. The court focused on the concept of ownership and the act ordered the transfer of ownership, not land or property. The court read Act 233 of 1984, Act 819 of 1985 and Act 847 of 1992 together as amended to conclude that ownership and the entitlement to revenues did not transfer until the application and evaluation process was completed in 1991 and 1992. The court noted the deletion in Act 819 of 1985 of the clauses relating to the DNR's settlement and distribution of funds or royalties to successful applicants. The court emphasized the fact that no plaintiff had filed an application prior to the effective date of Act 819 and used that fact to distinguish Douglas v. State, 208 La. 650, 23 So.2d 279 (1945), where the Supreme Court held that equitable title vested at the time that the plaintiff filed an application and renewed that application many years later and she was entitled to royalties collected by the State Mineral Board.[2]
The trial court did not mention that the reason that the plaintiffs could not file applications prior to the effective date of Act 819 of 1985 was that the Levee Board had obtained a restraining order which prevented DNR from establishing procedures or making applications available. The Board continued the legal attacks against the act even on rehearing at the Supreme Court and in federal court and collected sizable royalties each year that it postponed the title transfer.
The trial court dismissed the vested right argument because the plaintiffs did not have an absolute, complete, and unconditional right at the effective date of Act 233 of 1984 or Act 819 of 1985. The court concluded that the plaintiffs had a mere hope or expectation of a future benefit until the certification process was completed and property rights were transferred and that the 1985 amendment became effective before any titles had transferred. The court also discounted the inverse condemnation argument because title did not transfer and there was no unconstitutional taking by the Levee Board. It also found no due process or equal protection violation because the Levee Board, which owed no fiduciary duty, remained the owner of the property until titles were transferred in 1991 and 1992. However, the court fails to mention that the certification process was delayed solely by the actions of the Levee Board, which reaped the benefits of the delay. The trial court erred by focusing on the plaintiffs' failure to file applications and obtain title transfers when that was not possible at the time. As in Douglas where the State collected revenues generated by the land until it transferred title to the plaintiff, here the Levee Board retained royalties on lands until it was forced to transfer title.
The provisions of La.Const. Art. VII, § 14(B)(4) allowed the return of property and mineral rights to former owners of expropriated lands "when the legislature declares that the public and necessary purpose... has ceased to exist." The State's power to expropriate is limited by the public purpose doctrine. Melvin Dakin and Michael Klein, Eminent Domain in Louisiana, § 1 (1970). In Section 1 of Act 233 of 1984 the legislature clearly declared that the public and necessary purpose for the expropriation of the Bohemia Spillway lands had ceased *167 and ordered the Levee Board to return ownership to the former landowners or their successors.
Section 2 states that the Department of Natural Resources (DNR) had authority to establish procedures for the application process and "settlement and distribution of funds for successful applications ...," a reference to amounts of revenues paid after the effective date of Act 233. The DNR secretary was ordered to proceed immediately upon the effective date of the act (June 29, 1984) with the development of procedures to begin implementation of Act 233's by January 1, 1985, which clearly evidenced an intent that the act was effective as of June 29, 1984 and return of the property was to be carried out quickly.
Under Section 3 the Levee Board had to provide a "thorough accounting" to the DNR secretary or his designee concerning "all revenues" from the property and that information was to be made available to the applicants. "Accounting" has been defined as an act or system of making up or settling accounts or a rendition of an account. If by order of a court it imports a rendition of a judgment for the balance due. The term may include payment of the amount due. Black's Law Dictionary (5th ed.1979). Under a reasonable reading of the act, if an "accounting" did not encompass payment of royalties, an accounting was necessary only if the revenues were to be distributed to former landowners; it served no other purpose.
Section 5 provides that return of the property would be subject to all servitudes, mineral leases or other contracts executed by or with the Levee Board prior to Act 233's effective date. Lessees were entitled to negotiate with or make payments to the DNR until title passed. Implicit was the notion that the Levee Board had no legal right to lease the property, accept royalties or negotiate contracts after June 29, 1984. Section 5 also provided that all monies from royalties or rents attributable to property being returned "shall be paid by the [DNR] secretary to the appropriate persons," a clear reference to the landowners/heirs' right to royalties earned after the act's effective date which were paid to DNR.
Act 233 ordered that expropriated lands be returned.[3] The Levee Board had no right to revenues from the expropriated property after the legislature declared in Act 233 that a public and necessary purpose no longer existed. The act requires an accounting of the royalties earned after June 29, 1984 apparently to be paid to successful applicants. The different sections of the act read as a whole in pari materia declares that the Levee Board not retain the property and its revenues as of the effective date of Act 233.[4]
However, even if the language of Act 233 is considered unclear, the reasonable construction in light of the act's purpose is that the legislature intended to implement La. Const. art. VII, § 14(B) and return the property to the former owners or their heirs, who had been deprived of revenues from the lands since the 1920s. The preamble or title of Act 233 stated its purpose was to declare that the public and necessary purpose had ceased to exist and to order the return of certain property, including mineral rights, acquired by expropriation. The legislators could not return the property; the legislative intent was to order the Board, which had expropriated the lands, to return them. The legislators were aware that titles could not be transferred immediately, but nothing in Act 233 evidenced an intent that the Levee *168 Board retain the property and the revenues generated during the application process.
The Levee Board, which received mineral revenues of $3 million in 1986 from the expropriated lands, constitutionally attacked Act 233 in state court, but the act was held constitutional. The Louisiana Supreme Court noted that Art. VII, § 14(B)(4) was not self-operating and discussed Act 233 as comporting with specific requirements of the constitutional amendment, "which it was enacted to implement." Board of Commissioners, 483 So.2d at 967. The Court declared that by Act 233 the legislature "attempted to return land known as the Bohemia Spillway to the owners ...," Id. at 959, and stated: "The Legislature was free to return the Bohemia Spillway property under La.Const. art. VII, 14(B)(4) and they chose to do so when they passed Act 233 of 1984." Id. at 969.
On rehearing the Supreme Court again held Act 233 constitutional. 496 So.2d at 281. In its discussion the Court stated:
The purpose of the amendment at issue in this case is to effect the return of property taken or sold under distress to the state for a public purpose when that purpose has become extinct in order to prevent windfall to the state or to restrict the state to the gains it could reasonably expect from the acquisition of the property. Accordingly, we conclude that the framers and the people who adopted the amendment did not intend that any parcel or undivided interest of property should be retained by the state once the legislature declares extinct the public purpose for its acquisition and orders it returned to private ownership (footnote omitted).
Id. at 298. The intent of Act 233 of 1984, which implemented La.Const. art. VII, § 16(B), was to insure that the Levee Board did not retain the expropriated property and its mineral royalties after the effective date of the act.
The Levee Board argues that Act 819 of 1985 greatly changed Act 233. Sections 2, 4 and 5 were amended and reenacted. The Board focuses on the deletion of phrases in Sections 2 and 5 relating to the mineral lessee's right to negotiate contracts with the DNR, the settlement and distribution of funds for successful applications, and DNR's payment of royalties to appropriate applicants.
However, Section 3 of Act 233 was not amended by Act 819 and Act 233 continued to require the Levee Board to provide the DNR secretary with a thorough accounting of all revenues from the property. Act 233 after Act 819 of 1985 required a Levee Board accounting of revenues and royalties earned after June 29, 1984 which had to made available to the landowners.
The only possible explanation as to why Section 3 remained unchanged was that the legislature intended that there would be a tabulation of royalties. Regardless of whether an "accounting" encompasses the settling and payment of funds, the legislators had no need to order an accounting unless they contemplated the equitable distribution to applicants whose properties' revenues were collected by the Levee Board from 1984 to 1991 or 1992. Although the DNR's authority to establish procedures to settle and distribute funds was deleted, Section 3 after Act 819 still ordered the Levee Board to provide an accounting of revenues. Section 5 no longer entitled a mineral lessee to pay the DNR; however, the lessee's continued payments to the Levee Board had to be included in the Board's ordered accounting. The fact that the DNR was no longer given the responsibility to collect revenues, negotiate contracts, and distribute monies after Act 819 of 1985 did not mean that the successful applicants were not entitled to those royalties which had to be included in the Levee Board's accounting.
Section 2 of Act 819 retained the statement that the DNR secretary shall develop procedures to begin implementation of the provisions by January 1, 1985 even though the act was not approved until July 22, 1985. Section 4 of Act 819 was almost entirely new and provided that the DNR certify the valid applications to the Levee Board, which was required to take action within 60 days of receipt of certification to return ownership of the property. The procedures referred to transferring title and the legislators intended to return title to the property expeditiously. Yet the Levee Board argues that the intent was to allow it to continue to collect sizable *169 mineral royalties from 1984 to 1992 until titles were transferred to the owners.
Act 233 intended to return those lands and revenues to the owners and their heirs, and nothing in Act 819 shows a different intent. Act 819's preamble or title sets out as its purpose to amend and reenact Act 233 relative to the return of certain property known as the Bohemia Spillway. There is no express repeal of any language or section of Act 233 and implied repeals are not favored. Act 819 retained the order that the Levee Board provide an accounting. We agree with the Supreme Court that the framers or the voters who ratified the amended La.Const. art. VII, § 14(B)(4) did not intend for the Levee Board to retain ownership of lands once the legislature declared that they were no longer needed for a public purpose. See Board of Commissioners of Orleans Levee District, 496 So.2d at 281. Act 819 contains no declaration that the former owners were not entitled to the revenues until title passed although such a statement could have been included. Act 819 did not impliedly repeal Sections 2, 4, and 5 of Act 233.
Throughout years of court challenges the Levee Board received millions of dollars in mineral royalties from Bohemia Spillway lands. Equity dictates that the Levee Board, whose attack on Act 233 delayed transfers of title for years, should not be allowed to benefit from its decision not to follow the legislative mandate.[5]
The trial court erred by maintaining the Levee Board's exception of no cause of action as to monies representing revenues generated after June 29, 1984 and before the titles were transferred in 1991 or 1992 and by denying the plaintiffs' motion for new trial. The judgments are reversed and the matter is remanded for further proceedings.
REVERSED; REMANDED
NOTES
[1] This is one of three pending appeals that involve judgments by trial courts which maintain the Levee Board's exceptions of no cause of action as to actions by Bohemia Spillway former owners or their heirs. The other two cases are Vogt v. Board of Levee Commissioners of the Orleans Levee District c/w Edgecombe v. Board of Levee Commissioners of the Orleans Levee District (#95-CA-1187) and Riley v. Riley (# 94-CA-2226). Opinions in those cases will be rendered simultaneously with this opinion.
[2] In Douglas the State sold property to which it did not have title. Douglas, the buyer's heir, secured lieu warrants for the same number of acres of land of the same character. She filed an application in 1917 and in 1919 applied to the State Land Office for the location of the property. In 1939 she renewed the application, which was denied. After Douglas brought the matter to court, a patent was issued. Meanwhile in 1939 the State Mineral Board executed a lease and received revenues of $24,931.75 from the property. She sued the Board. The Supreme Court held that equitable title vested in Douglas at the time of the application and renewal. Id. at 283.
[3] The legislature used almost identical language in Sections 2, 3, 4 and 5 of Act 245 of 1985, which ordered the return of expropriated property from the Board of Levee Commissioners of the Buras Levee District. See generally Angelo v. Ales, 94-0320 (La.App. 1 Cir. 12/22/94), 649 So.2d 1042, writ denied, 95-0176 (La.3/17/95) 651 So.2d 274.
[4] The Louisiana Supreme Court utilized the concept of equitable title to render justice for a plaintiff who had applied for the necessary patent and warrant for land that she was entitled to have. The Court held that equitable title vested in the plaintiff at the time that she applied for the patent even though the state had legal title and she was entitled to the mineral revenues collected from the date of the application to the date the patent was issued. See Douglas v. State, 208 La. 650, 23 So.2d 279 (1945). The Levee Board argues that Douglas is distinguishable because here the plaintiffs had not filed their applications; however, the Board's legal attacks on the act prevented the application process for years.
[5] This Court has held that Bohemia Spillway landowners or successors who sought reimbursement for the revenues from 1924 to 1992 did not state a cause of action against the Levee Board based on its acts of expropriation as tortious. This Court held that Act 99 of 1924 authorized the expropriations and at that time the Levee Board was immune by virtue of sovereign immunity. Henry v. State, Orleans Levee District, 94-0658 (La.App. 4 Cir. 11/30/94), 646 So.2d 519. That case is not relevant.