848 So.2d 686 (2003)
Karen M. BIBBINS, d/b/a Xscape II
v.
The CITY OF NEW ORLEANS and the New Orleans Alcoholic Beverage Control Board.
No. 2002-CA-1510.
Court of Appeal of Louisiana, Fourth Circuit.
May 21, 2003.
*689 Robert G. Harvey, Sr., Maria Del Carmen Calvo, Harvey Jacobson & Glago, New Orleans, LA, for Plaintiff/Appellant.
Robin M. Shulman, Assistant City Attorney, Albert A. Thibodeaux, Chief Deputy City Attorney, Charles L. Rice, Jr., City Attorney, New Orleans, LA, for Defendant/Appellee.
(Court composed of Chief Judge WILLIAM H. BYRNES, III, Judge PATRICIA RIVET MURRAY, and Judge MICHAEL E. KIRBY).
WILLIAM H. BYRNES, III, Chief Judge.
Karen M. Bibbens d/b/a Xscape II (collectively "Club Xscape") appeals the trial court's judgment that affirmed the Alcoholic Beverage Control ("ABC") Board's decision that revoked the club's alcoholic beverage license. We reverse.

Procedural History
On June 27, 2001, the City of New Orleans ("City") filed a petition with the ABC Board to suspend or revoke the Club Xscape's permit to sell alcohol. The club is located at 810 North Claiborne Avenue in New Orleans. The City claimed that the Club Xscape violated City Code Section 10-157(5), Section 10-157(19) and Section 10-157(22), i.e., operating the establishment in a manner that permitted disturbance of the peace and/or created or maintained a public nuisance.
After a hearing on February 19, 2002, the ABC Board unanimously voted to revoke the Club Xscape's alcoholic beverage license. Around February 28, 2002, Club Xscape filed a petition for review in Orleans Civil District Court. On March 4, 2002, Club Xscape obtained a temporary restraining order staying the ABC Board's decision, which was vacated as premature on March 4, 2002. On March 8, 2002, the district court again granted Club Xscape's temporary restraining order and took the matter under advisement. On March 20, 2002, the district court affirmed the decision of the ABC Board. Club Xscape's appeal followed.
On appeal, Club Xscape contends that the trial court erred in: (1) failing to sustain the club's exceptions of vagueness and no cause of action; (2) failing to find that the facts were admitted because the City did not respond to the club's request for admissions; (3) failing to find a violation of the club's constitutional right to due process and a fair hearing; (4) failing to exclude hearsay testimony; and (5) finding sufficient evidence.

Exceptions of Vagueness and No Cause of Action
Club Xscape initially argues that the trial court erred in failing to sustain the club's exceptions of vagueness and no cause of action.
In deciding whether to sustain an exception of no cause of action, the court accepts the facts alleged in the plaintiffs' petition without reference to any extraneous supporting or controverting evidence and determines whether the law affords any relief to the plaintiff if those facts are proved at trial. Robinson v. North American Royalties, Inc., 470 So.2d 112 (La. 1985); Haspel v. Davis Milling & Planting *690 Co., Ltd. v. Board of Levee Com'rs of Orleans Levee Dist., 98-1664 (La.App. 4 Cir. 3/31/99), 732 So.2d 113, writ denied 99-1248 (La.6/18/99), 745 So.2d 29. For purposes of determining the issues raised by the exception, the well-pleaded facts in the petition must be accepted as true. Livaccari v. Alden Engineering, Inc., XXXX-XXXX (La.App. 1 Cir. 12/1/00), 808 So.2d 383; Roberts v. Sewerage and Water Bd. of New Orleans, 92-2048, p. 1 (La.3/21/94); 634 So.2d 341, 342-343. A peremptory exception of no cause of action presents a question of law, and thus appellate review is de novo. Jones v. Tezeno, 99-1693 (La. App. 3 Cir. 3/1/00), 758 So.2d 896; Wirthman-Tag Const. Co., L.L.C. v. Hotard, 2000-2298 (La.App. 4 Cir. 12/19/01), 804 So.2d 856. The burden of proof is on the exceptor. Haspel & Davis Mill. & Planting Co. Ltd. v. Board of Levee Com'rs of Orleans Levee Dist., 95-0233 (La.App. 4 Cir. 9/4/96), 680 So.2d 159, writ denied 96-2430 (La. 12/6/96), 684 So.2d 932.
In the present case, Club Xscape maintains that the City's petition failed to comply with the requirements of Section 93(A) of the Alcoholic Beverage Control Act (La. R.S. 26:1 et seq.), which provides that the petition shall set forth the facts and circumstances of the violation. Xscape also asserts that the petition does not comply with Rule 1(c) of the Rules of Procedure of the ABC Board because the City's petition is required to contain the factual basis for the alleged violations.
The City asserts that Paragraph VI of its petition provided sufficient facts and circumstances underlying the petition, including the names and address of all the victims and perpetrators, and a narrative detailing each of the events in the attached police reports.
In the present case, Paragraph III, IV, and VI of the petition state:
III.
That the Permittee named herein did commit, or through his agents and/or employees, did allow and/or permit and/or aid in the commission of certain acts on the licensed premises, which acts are in violation of laws of the State of Louisiana and City of New Orleans, all as set forth more fully below.
IV.
That the permittee, lessee, employee, and/or owner of the premises 810 N. Claiborne Ave., New Orleans, Louisiana 70116 at the alcoholic beverage outlet (hereinafter ABO) known as XSCAPE II, located at 810 N. Claiborne Ave., New Orleans, Louisiana, 70116 did violate the following on or about 2/10/01 and 5/13/01 and at that time:
a) New Orleans City Code Section 10-157(5): Relative to permitting any disturbance of the peace;
b) New Orleans City Code Section 10-157(19): Relative to the existence of a public nuisance.
c) New Orleans City Code Section 10-157(22): Relative to maintaining or creating a nuisance. d) Since the violations of local, state, and/or federal regulations are statutes relating to ABO'S as may be discovered prior to and proven at the hearing this month.
* * *
VI.
The factual basis for the alleged violation(s) are as stated, but not necessarily limited to, the facts as related in the attached police report(s), or summons(es) or other documents of the city, state, or federal government, or their respective agencies, said documents being marked as Exhibit A en globo, attached *691 hereto, and made a part of this petition as if copied in extenso within:
1) Police report # B-15587-01, dated 2/10/01;
2) Police report # E-22498-01, dated 5/13/01;
3) Supplemental Police Report # E-224980-01, dated 5/24/01; and
4) Such other reports of activity at or about this ABO location which may be discovered and produced at the hearing.
Paragraph VI infers that the City is not limited to the facts related in the three specific police reports. Paragraph VI also included that: "The factual basis for the alleged violation(s) are as stated, but not necessarily limited to, the facts as related in the attached police report(s), or summons(es) or other documents of the city, state, or federal government, or their respective agencies [emphasis added]." The paragraph added to the list of itemized police reports: "[s]uch other reports of activity at or about this ABO location which may be discovered and produced at the hearing [emphasis added]." However, these catchall phrases are inadequate to show with specificity any additional claims, and they cannot be considered.
In the present case, additional documents of other incidents not attached to the petition should not be reviewed. Only the attached police reports in reference to the incidents of February 10, 2001 and May 13, 2001 are considered. A review of the petition to determine if the City stated a cause of action is limited to allegations concerning those two dates.
The Club Xscape questions that a cause of action exists based on whether the City's petition stated adequate facts that support a legal conclusion for which the club can be found to have permitted a disturbance of the peace and/or created or maintained a public nuisance.
The trial court may not assume any facts not in the plaintiff's original or amended petitions in determining whether to grant an exception of no cause of action. Simmons v. Templeton, 97-2349, 98-0043 (La.App. 4 Cir. 11/10/99), 723 So.2d 1009, writs denied 98-3050, 3060 (La.2/5/99), 738 So.2d 4, 5. It is insufficient to state a cause of action where the petition simply states legal or factual conclusions without setting forth facts that support the conclusions. Kahn v. Jones, 95-259, p. 7 (La.App. 3 Cir. 11/2/95), 664 So.2d 700, 704; Butler v. Reeder, 93-764, p. 2 (La.App. 5 Cir. 3/16/94), 635 So.2d 1206, 1207.
In Williams v. Galliano, 97-1972 (La.11/14/97), 703 So.2d 1283, a refuse collector was killed when he was struck by another vehicle while making delivery at a landfill. The deceased's estate brought an action against the operator of the landfill, and in an amended petition, the estate added a claim against the State Department of Environmental Quality ("DEQ"). The DEQ filed peremptory exceptions of prescription and no cause of action. Among other things, the First Circuit found that the allegations were factually sufficient to state a claim against the DEQ, and that the DEQ has a statutory duty to monitor solid waste landfills for compliance with rules and regulations, breach of which may serve as basis for finding of liability. The Louisiana Supreme Court reversed the First Circuit's finding that the petition stated a cause action against the DEQ and that the State owed a duty to the third party who was injured in that case. The Supreme Court held:
... Even assuming that the State, through the Department of Environmental Quality, has some duty to monitor landfills for compliance with permit regulations, that duty does not extend to *692 third parties (especially where the third party's injury is unrelated to the regulation of environmental conditions). See Berry v. State, DHHR, 93-2748 (La.5/23/94), 637 So.2d 412. Accordingly, the judgment of the trial court is reversed, and judgment is entered in favor of the State, dismissing it from the suit.
In a wrongful death action, Elliott v. Merritt, 457 So.2d 1216 (La.App. 1 Cir. 1984), writ denied, 461 So.2d 315 (La.1984), the First Circuit held that the petition that alleged only that the owner was the owner of the vehicle and that the owner failed to supervise the driver's proper operation of the vehicle, failed to state a cause of action for which the owner could be held liable for the driver's negligence. The First Circuit stated:
In the present case, plaintiffs' petition contains no factual allegations which would impute the negligence of the driver, Merritt, to the owner of the vehicle, Olivier. Plaintiffs allege that Olivier, as owner of the vehicle, failed to supervise the operation of the vehicle. However, plaintiffs made no allegations establishing a legal obligation or duty on Olivier to supervise the driver of its vehicle. No master-servant, parent-child or custodial relationship is alleged, nor does the petition contend that the owner granted authority to use the vehicle when it knew the driver was incapable or incompetent to operate it. Without an allegation creating a legal responsibility or obligation on Olivier, plaintiffs have failed to state a cause of action for which Olivier could be held liable for Merritt's negligence. Cf. McCoy v. Chambers, 403 So.2d 838 (La. App. 2nd Cir.1981).

Id. at 1218.
In Wimberly v. White, 54 So.2d 869 (La.App. 1 Cir.1951), the First Circuit found that the absence of facts in a petition for revocation of liquor license, could properly be raised by either an exception of vagueness or exception of no cause of action. LSA-R.S. 26:91. The First Circuit reversed the decision of the Board and the district court that revoked a liquor permit because the City's petition did not meet the Codal requirements. The First Circuit stated:
Our law provides for revocation of a permit only after a hearing, and the hearing is to be held after the permittee is apprised of the facts and circumstances of the violation charged against him or her. Without advance notice of those facts the permittee cannot prepare for the hearing....

Id., 54 So.2d at 872.
The Third Circuit sustained the permittee's exception of vagueness and dismissed the complainant's petition at the complainant's costs.
In the three police reports attached to the petition in the present case, the City failed to state by what acts, the Club Xscape allegedly permitted a disturbance of the peace and/or in any way caused a public nuisance on February 10, 2001 and May 13, 2001. Assuming that all the allegations are true, the petition failed to state how the Club Xscape was the cause of the disturbance of the peace or the existence of a nuisance because of the attempted murder charge dated February 10, 2001, or the murder charge dated May 13, 2001. The criminal charges were brought against specific individuals who were not agents or employees of the Club Xscape. The connection with the club was the location; however, the criminal acts did not occur on the premises of the club but on the street. One police report stated that: "WARD [the attempted murder victim] did say that he had become involved in an altercation in the bar [Club Xscape] with several unknown *693 Black males which continued outside and became physical." This reference indicates that any argument or altercation became physical outside of the club. The petition and the attached police reports do not adequately provide facts that would show that the Club Xscape permitted a disturbance of the peace and/or caused a public nuisance as a matter of law. The trial court erred in not sustaining the Club Xscape's exceptions of vagueness and no cause of action.
Considering that the record is before us, a review of the Club Xscape's other claims, including consideration of the merits of the case, follows. See Wimberly, id.

Claims of Due Process, Hearsay and Request for Admissions
Club Xscape also maintains that it was denied due process and a fair trial. The club submits that the City did not provide the club with a witness list, and never filed a witness list into the record, thereby not giving notice of the evidence.
Club Xscape further contends that the trial court erred in not excluding the City's witnesses' testimony that was hearsay.
Club Xscape also argues that the trial court erred in failing to find that the facts were admitted because the City did not respond to the club's request for admissions. Club Xscape asserts that when a party receives a request for admissions and fails to respond to the request by any means, facts are deemed admitted.

Due Process
An entity or individual engaged in the sale of alcoholic beverages is entitled to the constitutional right to due process of law. Paillot v. Wooton, 559 So.2d 758 (La.1990). Due process requires notice of the evidence. Id., at 761. A hearing is required to be held after the licensee or permittee is appraised of the facts and circumstances of the violation charged. Section 93 of the Alcoholic Beverage Control Act (La. R.S. 26:1 et seq.); Rule 1(c) of the Rules of Procedure of the ABC Board; Wimberly, supra, 54 So.2d at 872.
In the present case, counsel for the Club Xscape objected to the testimony of the City's witnesses because the City failed to file a witness list. The Board denied the club's request for a continuance and allowed the City's witnesses to testify. Because the City failed to provide a witness list, the Club Xscape was deprived of due process and a fair hearing. The trial court abused its discretion in allowing the City's witnesses to testify without a continuance.

Hearsay
Club Xscape further contends that the trial court erred in not excluding the City's witnesses' testimony as hearsay and finding that the City provided sufficient evidence to support the claim that the plaintiffs violated the City Codes.
In Brossette v. Alcoholic Beverage Control Bd., 611 So.2d 1391 (La.1993), the Louisiana Supreme Court reversed the six-month suspension of the licensee's liquor license. The Supreme Court found that a large amount of the testimony that had been admitted was hearsay because various police officers testified about what they had been told by others. Id., 611 So.2d at 1392.
The Supreme Court noted:
At the hearing, hearsay evidence was admitted, despite the objection of Brossette's attorney. Various police officers testified primarily about what they had been told by others.
Id.
* * *
At the Board hearing, the police officers repeated other parties' complaints to prove that Brossette's club was the location of criminal activity. Investigative *694 reports by police are subject to the hearsay rule. LSA-C.E. art. 803(8)(b)(i). The Authors' Comments point out that complaints of crime made to the police are not admissible evidence, being hearsay within hearsay.
Brossette was entitled to a district court trial de novo under LSA-R.S. 33:4788. See P & G Retailers, Inc. v. Wright, 590 So.2d 1272 (La.App. 1st Cir. 1991). At that trial, the hearsay evidence at the Board hearing should have been excluded.
Id. at 1394.
In the present case, Lieutenant Tami Brisset and Sergeant Kevin Anderson referred to print-outs from a computer database concerning various incidents. The officers' references to print-outs was hearsay and should have been excluded. The print-outs were not part of the record. The testimony of all witnesses not based on first-hand knowledge was hearsay and was not competent evidence.

Request for Admissions
Club Escape also argues that the trial court erred in failing to find that the facts were admitted because the City did not respond to the club's request for admissions. The club noted that: Rule 6(B)(1) of the New Orleans ABC Board provides:
Any party to a revocation and/or suspension hearing may also obtain discovery to requests for admissions of fact, as provided for in the Louisiana Code of Civil Procedure.
When a party receives a request for admissions and fails to respond to the request by any means, facts are deemed admitted. Tandy v. Pecan Shoppe of Minden, Inc., 34,578 (La.App. 2 Cir. 4/4/01), 785 So.2d 111. Failure to answer a requested admission of fact within the prescribed delay constitutes conclusive admission of those facts. Hoskins v. Caplis, 431 So.2d 846 (La.App. 2 Cir. 1983).
The Club's September 11, 2001 request for admissions included:
Request for Admission # 1:
... [T]hat in the police report B-15587-01 dated February 10, 2001, the activity complained of, more specifically attempted homicide, carrying a firearm, simple criminal damage to property belonging to Jonathan Allen and flight from and flight from [sic] an officer did not occur on the premises at 810 North Claiborne Avenue and involving Karen Bibbins, owner of 810 North Claiborne Avenue.
Request for Admission # 2:
... [T]hat police report E-22498-01, to include its supplement dated May 13, 2001, as it relates to negligent homicide did not take place within the premises at 810 North Claiborne Avenue, nor did it involve its owner, Karen M. Bibbins.
Request for Admission # 3:
... [T]hat the specific violations referred to in Paragraph 4 in its petition a, b, and c do not apply to Karen M. Bibins [sic] or the property located at 810 North Claiborne Avenue.
Because the City failed to answer, the above facts contained in the Club Xscape's request for admissions should have been deemed as admitted by the City. The trial court erred in failing to accept the admissions as true.
Considering that the City failed to provide a witness list that resulted in the Club Xscape's being deprived of due process and a fair hearing, and considering the admissions of fact as well as the inadmissible hearsay evidence, there was insufficient evidence to show that the Club Xscape's permit should be revoked. The City did not carry its burden of proof to show that the Club Xscape created a *695 nuisance or disturbance of the peace by a preponderance of the evidence.

Claim of Insufficiency of Evidence
Regardless of the lack of due process without a witness list from the City, the hearsay testimony, and the admissions, the Club Xscape further maintains that the City did not provide sufficient evidence to support a finding that the Club permitted a disturbance of the peace and/or caused a public nuisance on February 10, and May 13, 2001.

Standard of Review
A liquor licensee or permittee is entitled to a trial de novo on appeal to the district court from the local ABC Board's decision under La. R.S. 33:4788. The standard of review from the decision of an administrative body is to determine if the administrative hearing was conducted under the procedural formalities of the statute; if the fact-finding of the administrative body was supported by substantial evidence; and if the administrative body's conclusion was arbitrary or constituted an abuse of discretion. La. R.S. 49:964.
On further review by the state appellate court, the manifestly erroneous or clearly wrong standard applies to the findings of the district court. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). Where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. Virgil v. American Guarantee & Liability Ins. Co., 507 So.2d 825 (La.1987). The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990).
Appellate review of questions of law is simply a review of whether the lower court was legally correct or legally incorrect. O'Niell v. Louisiana Power & Light Co., 558 So.2d 1235, 1238 (La.App. 1 Cir.1990). Where the facts are not in dispute, the reviewing court must consider whether the trial court came to the proper legal determination under the undisputed facts. La. C.C.P. art. 2164; Maryland Cas. Co. v. Dixie Ins. Co., 622 So.2d 698 (La.App. 1 Cir.1993), writ denied 629 So.2d 1138 (La.1993); Mallery v. International Harvester Co., 14,823 (La.App. 3 Cir. 11/6/96), 690 So.2d 765, writ denied, 97-1323 (La.9/5/97), 700 So.2d 512.
In the present case, the City claims that the ABC Board has the authority to have Club Xscape's liquor license revoked under various ordinances. New Orleans City Code Section 10-157(2) provides in pertinent part:
Any city retail alcohol beverage permit shall be suspended or revoked, or remedial actions as set forth in section 10-160 shall be imposed, for the following reasons...
In its petition, the City asserted grounds for revocation of Club Xscape's liquor license under subsections of the New Orleans City Code Section 10-157.
Section 10-157(5) states:
Permitting any disturbance of the peace or obscene, lewd, sexually indecent, immoral or improper conduct on the licensed premises. Improper conduct, as specified in this subsection, shall consist of actions which violate the penal provisions of this code or other penal ordinances of the city. [Emphasis added.]
Section 10-157(19) provides in pertinent part:

*696 Determination of the existence of a public nuisance, as defined in titles 13, 14 and 40 of Louisiana Revised Statutes or any other applicable law, by a court of competent jurisdiction.
Section 10-157(22) states:
Maintaining or creating a nuisance within the meaning of article 667 of the Louisiana Civil Code.
La. C.C. art. 667 provides in part:
Although a proprietor may do with his estate whatever he pleases, still he cannot make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him....
The City asserts that a public nuisance provides an injury, a certain condition or circumstance(s) generally affecting the public, citing State ex rel. Dema Realty Co. v. McDonald, 168 La. 172, 121 So. 613 (1929). The City avers that drunkenness, fights, disturbances of the peace, etc., constitute a public nuisance because those things affect the public generally, citing State v. Scallan, 201 La. 1026, 10 So.2d 885, 889 (1942). The City submits that fights and numerous violent crimes perpetrated in and around the Club Xscape during operating hours constituted a public nuisance directly affecting the adjacent property owners' use and enjoyment of their property.
Rule 8 of the Rules of Procedure for the Alcoholic Beverage Control Board provides in pertinent part:
The burden of proof in suspension or revocation proceedings before the Board shall be on the City Attorney and shall be by a preponderance of the evidence. The City Attorney may carry his burden by making a prima facie case....
Proof by a preponderance of the evidence is sufficient when the evidence, taken as a whole, shows that the fact sought to be proved is more probable than not. Lewis v. River City Const., 2001-2100 (La. App. 4 Cir. 4/17/02), 816 So.2d 906.
Club Xscape avers that pursuant to the New Orleans City Code Section 10-157(5), the City's witnesses were unable to testify that any acts of the club showed that the club allowed on its premises the occurrence of the two incidents provided in the petition.

Testimony of the City's Witnesses
Edwin Paul Compass, the Chief of Operations for the City of New Orleans, testified that he had no recollection of the events that occurred on February 10, 2001 or May 13, 2001. He did not know anything related to Tyrone Ward, the alleged victim of an attempted homicide that took place on February 10, 2001. He had not reviewed the City's petition or the attached police reports. He did not know specific dates or times. He said he was giving an overview, not specifics.
Chief Compass said that in four years he had been to the club at least 50 times. He testified that there were at least three murders and five to ten shootings in the vicinity of the club. He explained that he went to the club: "Not just for shootings and murders, but for the traffic congestion problems and just the overall nuisance it would cause with the large crowd spilling out from under the bridge." The crowd in front of the club overflowed to the I-10 underpass. He agreed that there were several clubs in the area.
Chief Compass acknowledged that the club's owner, Ms. Bibbins, did not have the right to go outside of her club and direct traffic. He remarked that: "if the club wasn't open, the cars wouldn't be there." He stated that community groups complained about the club, and also "about not seeing a lot of patrols in the area, active patrols."
*697 Chief Compass spoke with the owner on several occasions. He stated that: "I knew she hired extra security people. I met with the client and she hired extra security people and she attempted to rectify some of the problems." He said that the crowds were overwhelming outside of the club. When asked if Ms. Bibbins had any paid details there or security guards, Chief Compass replied: "Well, police officers can't work paid details at alcoholic beverage outlets. She has security guards."
Chief Compass remembered arguments in the Club Xscape that resulted in violence taking place outside. The Club Xscape notes that the police chief referred to a murder that took place in 1997 at the Club Climax, which was not owned or operated by the Club Xscape at that time. The Club Xscape objected to Chief Compass' testimony that was outside the scope of the petition and the three attached police reports.
Captain Newel Smith, Officer Commander of the New Orleans Police Department's First District, had no knowledge of the events that occurred on February 10, 2001. The Club Xscape noted that the City did not question Captain Smith about the events of May 13, 2001.
Captain Newel Smith related that: "There are large numbers of individuals who hang outside of the club, underneath the interstate." He explained that: "The elevated portion of the interstate is on the neutral ground area of North Claiborne Avenue. Club Xscape is across the street from the neutral ground on the river side of North Claiborne Avenue." Further, he remarked that: "There are a large number of vehicles parked underneath the I-10, and it's a continuous movement of individuals."
Captain Smith stated that the problem with the Club Xscape is due to the fact that the club plays music, people dance, and they serve alcohol. He did not know what kind of music was played, and he agreed that several other clubs in the vicinity played music and served alcohol. He also agreed that other clubs are on the same side of the street as Club Xscape.
Captain Smith related that he agreed with Chief Compass that the Xscape Club should be closed to make it a better and safer community. He said that there were territorial wars in the area, but he could not testify if any of these wars occurred inside the Club Xscape. He had been assigned to the First District for two months before the hearing, and he could not give reasons for the incidents that occurred inside or outside of the Club Xscape on February 10, 2001 or May 13, 2001. Captain Smith's knowledge of a murder that occurred two days before Mardi Gras on February 10, 2002, was outside of the scope of the City's petition. His testimony concerning events not occurring on the above two dates in 2001 was inadmissible. His testimony not based on first-hand knowledge was hearsay and should have been excluded.
Lieutenant Tami Brisset had a computer printout concerning incidents that occurred in the 800 and 900 blocks of North Claiborne, Claiborne and Basin, Claiborne and St. Ann, as well as Claiborne and Dumaine. Her testimony showed that the vicinity was a high crime area. She testified about an alleged shooting that put her at risk that occurred between the 800 and 1000 block of Claiborne. She said: "I was involved in a shootout which ended up having four people shot and several guns were confiscated underneath the overpass.... The overpass is an area where we have a lot of vehicles that park up in there. A lot of those vehicles are for Club Xscape and for the other clubs that are in the area as well. But a good portion of *698 them are for Club Xscape." According to Lieutenant Brisset, the shooting took place at the corner of Basin and Claiborne in front of or by the Club Treme, but not near the Club Xscape. It was her suggestion that the Club Xscape should be closed down because of the public safety issue and the propensity for violence.
Lieutenant Brisset did not refer to particular incidents except the murder on February 10, 2002, and the incident in which she was involved in the shootout under the overpass that involved the Club Treme. The Club Xscape objected to Lieutenant Brisset's testimony based on incidents not in the petition. Events other than those in the City's petition or provided in the police reports concerning February 10, 2001 and May 13, 2001, should not be considered.
Detective Kevin Anderson testified on behalf of the City. The transcript includes the following questioning and reply:
Q. Now, the May 13, 2001 murder of Gregory Enclade, that did not occur at the Club Xscape?
A. No. It occurred in the 800 block of North Claiborne.
Detective Anderson could not say what evidence he had that associated the club with the incident of May 13, 2001 that occurred in the 800 block of Claiborne. Detective Anderson could not state what happened on February 10, 2001. He did not remember the incident. When asked whether the police report indicated that the club and/or Ms. Bibbins were involved in the incident, he reviewed the report. He said that Detectives Mark Amos and Ernest Bickham were there and could answer that question. (However, they did not testify.)
Sergeant Kevin Anderson referred to print-outs from a database that listed events that occurred in or around the vicinity of the Club Xscape in the 700 block, 800 block, and the 900 block of North Claiborne during the past five years. He referred to two events on November 17, 2001 and July 22, 2001 that occurred in the Club Xscape. He had knowledge of the murder that occurred on February 10, 2002. Sergeant Anderson said that on April 9, 2000, an altercation began in the Club Xscape; however, the print-out did not reflect that the same individuals inside the club were the ones involved in the alleged shooting outside the club. The events from the print-outs had not occurred on February 10, 2001 or May 13, 2001. Sergeant Anderson would not produce the print-outs but said they were used as investigative tools. He testified from the print-outs because he did not have time to get the police reports. He offered to give the police item numbers but could not say whether the reports mentioned the Club Xscape. References to incidents other than the two in 2001 that were included in the City's petition and attached police reports should not be considered.
Detective Randy Greenup, a witness for the City, testified that the May 13, 2001, incident occurred underneath the overpass at the 800 block of North Claiborne and then testified that the incident occurred at "913 block of North Claiborne." Detective Greenup testified that one of the individuals involved in the May 13, 2001 incident said that he recognized another individual from inside the club earlier that night. When asked if he investigated an alleged homicide at 810 North Claiborne Avenue at the Club Xscape, Detective Greenup answered:
Actually, I investigated a homicide which occurred in the 800 block of North Claiborne. It originated in the Club Xscape II. It was an argument that happened inside, later came outside. Everyone thought that the argument was *699 overseveral individuals got into an altercation outside underneath the overpass, and that is where the homicide took place....
The police report prepared on the night of the incident showed that the incident occurred in the vicinity of 913 block of North Claiborne. When asked if 913 North Claiborne was actually the location of Jack & George's, which was across the street on the other side of the interstate a block away, Detective Greenup could not say. Detective Greenup could not testify about the incident of February 10, 2001, because his duties did not concern the arrest resulting from that incident.
The Club Xscape objected, but Father Michael Jacques testified although his name had not been provided in a witness list. He said that he does not drive down St. Phillip to Claiborne when he goes out to dinner from 7:00 p.m. to 10:00 pm. or midnight although he was familiar with the fact that the Club Xscape opens at 11:00 p.m. He testified concerning the murder that occurred at the Club Climax that was not owned or operated by Club Xscape. Because Father Jacques did not testify about the dates set out in the petition, his testimony was inadmissible.

Testimony of the Club Xscape's Witnesses
Virgie Bibbins, the owner of the Club Xscape, testified that five workers outside provide security at the club. No one is allowed to enter with any type of weapon. The security employees search and check individuals and use scanners to scan individuals before they are allowed to enter. Hats, coats, and jackets are checked. Individuals are searched with their arms up and legs opened. They are frisked from the top of their heads to their feet.
Inside there are three security employees. Customers who are 21 or over must wear bands. Those without bands are not served liquor. If a customer gives a drink to another customer who is not allowed to drink, the security workers escort the two customers outside of the club. Ms. Bibbins is always at the club when it is open. Her two daughters and husband also are there. Ms. Bibbins intimated that she would not allow her daughters to be present if she thought someone could be injured in the club. Prior to the February 19, 2002 hearing, Ms. Bibbins had not received any citations for disturbing the peace or maintaining or creating a public nuisance.
After the murder that occurred on February 10, 2002 (testimony of which was beyond the scope of the petition), as a greater precaution, Ms. Bibbins stated that when the customers are checked, they are required to remove their shoes because a scanner could have missed a gun placed in a pair of Timberland boots, which a lot of customers wore. Each time a customer left the club, the customer would be searched and scanned again before he could re-enter the club. Ms. Bibbins testified that she has no control over individuals outside going under the interstate and getting weapons.
Julie Harvey, a security worker, testified on behalf of Club Xscape. She had worked at the club since Ms. Bibbins opened it. Her testimony confirmed Ms. Bibbens' testimony concerning the security methods used in the club. When asked by the Board about the February 10, 2002 homicide inside the club, she testified that the gun probably was in a Timberland boot that had escaped door security. Besides the February 10, 2002 shooting, no other incidents like shooting or stabbing had occurred in the club. Where no reference to the February 10, 2002, incident was included in the City's petition, the Board improperly elicited her testimony concerning this event. That testimony was inadmissible.

*700 Brossette v. Alcoholic Beverage Control Bd.

In Brossette v. Alcoholic Beverage Control Bd., supra, two women were involved in an altercation in the club that continued outside in the parking lot. The altercation involved aggravated assault and second degree murder charges. One of the police officers testified that he investigated the alleged assault, where an armed employee chased out of the club a customer who had a fight with his seventeen-year-old daughter. The Louisiana Supreme Court found that this testimony was inadequate to suspend the club's permit. The Supreme Court stated:
The Alcoholic Beverage Control Law, LSA-R.S. 26:1, et seq., provides for both state and local permits. See LSA-R.S. 26:78. However, permits cannot be suspended except for the causes specified in that Chapter. LSA-R.S. 26:94. Permits may be suspended or revoked for violation of municipal ordinances authorized by that Chapter. LSA-R.S. 26:91(5)(c).

Id., 611 So.2d at 1394.
The Supreme Court held:
There was one murder at the Club and one serious fight. There were numerous arrests in the vicinity, a high crime area. There was no evidence that Brossette committed, attempted, conspired, aided, abetted or encouraged anyone to commit any act adversely affecting the public health, safety or morals. On the contrary, Brossette cooperated with the police, employed police protection for his Club and suffered from its location in a high crime area. Brossette acted as a police informant and tried to protect both his premises and his customers. Crime in the area was not a sufficient basis to close the Club.
Id.
In his concurrence, Judge Shortess stated:
I agree with the majority opinion and further note that the dissenting judge below astutely observed that it was "unfortunate both for Mr. Brossette and the surrounding community that his place of business became the site of criminal activity by third persons; however, that circumstance is not enumerated as a basis for revoking a license under the Wine, Beer and Liquor Ordinance." (Emphasis mine.)

Id. at 1394-1395.
The Supreme Court reversed the suspension of Brossette's liquor license and assigned costs to the defendant insofar as provided by law.
Based on Brossette, supra, in the present case, the fact that an argument may have occurred in the Club Xscape which became physical outside does not constitute adequate competent evidence that the club or its owner committed or permitted a disturbance of the peace and/or public nuisance. As in Brossette, there were numerous arrests in the vicinity, a high crime area. There was no evidence that Ms. Bibbins committed, attempted, conspired, or abetted anyone to commit any acts adversely affecting the public health, safety or morals.
Just as Brossette cooperated with the police, Ms. Bibbins' testimony shows that she has five security workers who search, check, and scan the customers. After the murder that occurred on February 10, 2002 (testimony of which was beyond of the scope of the petition), as a greater precaution, Ms. Bibbins stated that when the customers are checked, they are required to remove their shoes because a scanner could have missed a gun placed in a pair of Timberland boots, which a lot of customers wore. Ms. Bibbins has no control over individuals going under the interstate and getting weapons. The Club *701 Xscape has taken precautions to ensure the safety of its patrons. Although Ms. Bibbins did not have the authority to direct traffic, she limited the number of customers inside the club as required. The club cannot be held accountable for the acts of third persons because the club is in the vicinity of criminal activity in a high crime area.
In light of Brossette, the City failed to carry its burden of proof by a preponderance of the evidence that the Club Xscape permitted a disturbance of the peace and/or created a public nuisance on February 10, 2001 and May 13, 2001 in the present case. The trial court was manifestly erroneous and clearly wrong in affirming the ABC Board's revocation of the club's liquor permit.
Accordingly, the judgment of the trial court and the order of the Board are reversed; the revocation of the Club Xscape's liquor permit is vacated; and the complaint is dismissed with costs allocated to the City.
REVERSED.