JjMOON LANDRIEU, Judge Pro Tempore.
This wrongful death action involves the demise of Samuel Crutchfield, who was struck and killed by an inebriated driver of a pickup truck while the victim was standing on the road next to his tractor-trailer.
Civic Center Site Development Company, Inc. d/b/a Holiday Inn Downtown Superdome, GAN National Insurance Company, and Ace America Insurance Company (collectively “Holiday Inn”) together appeal a judgment in favor of the plaintiffs. The judgment found that the Holiday Inn was 40 percent at fault for *373 the accident. We reverse in part and amend in part.
Plaintiffs claimed that on or about February 20 and the early morning hours of February 21, 1998, Derek Landry, his minor twin brother, Eric, and his minor friend, Eric Sziber, allegedly went to the Holiday Inn located at 330 Loyola Avenue in New Orleans where they were served alcoholic beverages to the point of legal intoxication. Plaintiffs asserted that Holiday Inn then allegedly allowed the minors to leave the hotel and operate a car with reckless disregard for public safety, causing Mr. Crutchfield’s death.
Mr. Crutchfield had stopped his tractor-trailer in the median at the Loyola Avenue exit on eastbound Interstate 10 and was securing his load when he was 1 ^struck and killed by Melvin Landry’s pickup truck, then being driven by Derek Landry on a suspended driver’s license.

Procedural History

Michelle Crutchfield, individually and on behalf of the estate of Samuel Crutchfield and as natural tutor and legal guardian of Samuel Crutchfield’s unborn child, and Ka-they Dread, natural tutor and legal guardian of Aaron Thomas Dread, minor child of Samuel Crutchfield, filed suit for damages arising out of the allegedly wrongful death of Samuel Crutchfield. Made defendants were Derek Landry, a minor, who operated the vehicle that struck and killed Crutchfield; Tracy Carlton, Landry’s natural tutor and legal guardian; the estate of Melvin Landry, owner of the vehicle being driven by Derek Landry; Midland Risk, insurer of Melvin Landry’s vehicle; USF & G Insurance Company as insurer of TRISM, Inc., Crutchfield’s employer and owner of the tractor/trailer rig Crutchfield operated at the time of the accident; Melvin Landry’s unnamed insurer; Holiday Inn, Inc. and its insurer.
On December 1, 1998, plaintiffs filed a first supplemental and amending petition adding as plaintiff Samantha Lois-Joann Cooper-Crutchfield, decedent’s minor child, and adding as defendants Holiday Inn Superdome, Holiday Hospitality Corporation, and Lexington Insurance Company and Hartford Insurance Company as TRISM, Inc.’s insurers. Lexington answered with a general denial and request for jury trial.
On June 14, 1998, plaintiffs moved for partial summary judgment establishing policy coverage. On August 11, 1999, the trial court granted the motion as to Lexington, finding uninsured/underinsured motorist coverage insuring TRISM for the accident in question. The court designated its judgment as final and |3appealable pursuant to LSA-C.C.P. arts.1915 and 2083. On August 30, 2000, the trial court granted Lexington’s motion for suspensive appeal. This Court affirmed the trial court’s judgment by opinion dated January 31, 2001.
On October 20, 1999, the trial court granted Holiday Inn’s motion for summary judgment dismissing plaintiffs’ claims for punitive damages.
On July 13, 2000, Hartford Insurance Company tendered $1,000,000.00 to settle plaintiffs’ claims.
On March 14, 2001, the children’s natural tutrix filed a petition for authority to settle their claims against Lexington upon payment of $970,000 to each of the minor Crutchfield children, for a total of $4,850,000.00.
On July 20, 2001, plaintiffs filed a sixth supplemental and amending petition on behalf of Michelle Crutchfield, individually and on behalf of Samantha, of Aaron Thomas Dread and Shirley Biratu as natural tutrix and legal guardian of Samuel Lynel Crutchfield and KeShana Lanaice *374 Crutchfield, decedent’s minor children. In addition to the original defendants, plaintiffs named Midland Risk Insurance Company, allegedly Derek Landry’s insurer; Hartford, allegedly TRISM’s insurer; Civic Center Site Development Company, Inc. d/b/a Holiday Inn Downtown Superdome; GAN National Insurance Company, allegedly Civic Center’s insurer, and CIGNA Property and Casualty Insurance Company, allegedly Civic Center’s umbrella liability insurer.
On August 2, 2001, Aaron Thomas Dread alleged that on July 16, 2001 he reached the age of majority and moved for release of the minor funds held in the registry of the court on his behalf. The trial court denied the ex parte motion.
On August 2, 2001, the trial court granted plaintiffs’ motion to dismiss Lexington because of the settlement. It also granted plaintiffs’ motion to dismiss |4Holiday Inn, Inc., Holiday Inn Superdome and Holiday Hospitality Corporation without prejudice.
On August 8, 2001, plaintiffs moved for partial summary judgment based on the claim of Hartford’s bad faith.
On August 21, 2001, Michelle Crutch-field moved ex parte to place the proceeds of Samantha’s settlement with Lexington in the net amount of $646,846.66 and with Hartford in the net amount of $125,000.00 in trust for administration, management and investment in accordance with the Louisiana Trust Code. The trial court set the matter for hearing. On August 21, 2001, Ms. Biratu filed a similar motion on behalf of KeShana and Samuel Crutchfield, each of whom received $125,000 in settlement from Hartford and $641,346.66 in settlement from Lexington. The trial court set that matter as well for hearing.
On August 28, 2001, Ace American Insurance Company, formerly known as CIGNA Insurance Company, answered plaintiffs’ original, first, second, third, fourth, fifth and sixth supplemental and amending petitions.
On November 20, 2001, the trial court ordered that $130,823.23 be released to Aaron Thomas Dread through his attorney of record.
On January 3, 2002, the trial court granted Midland’s petition to deposit its remaining policy limits of $5,127.40 in the registry of the Court for the benefit of the plaintiffs in concursus.
On January 25, 2002, the plaintiffs moved to settle the minors’ claims against Hartford for a net amount of $118,323.69 and a gross amount of $198,500.00. The trial court approved the settlement by judgment dated January 29, 2002.
|BOn January 25, 2002, Midland filed a second supplemental and amending petition for concursus, correcting a technical error in its original filing.
On March 15, 2002, Ms. Biratu filed an ex parte motion to release the funds received from Lexington and Hartford in settlement of the claims of her minor children KeShana and Samuel Crutchfield because of an interruption of Worker’s Compensation Death Benefits and reduction of benefits occasioned by Aaron Dread’s having become emancipated. Ms. Biratu outlined the children’s special needs in support of the motion. The trial court denied the motion by judgment dated December 3, 2002.
Following the taking of discovery in this matter, on July 11, 2002, Ace filed a motion for summary judgment to dismiss plaintiffs’ claims.
On September 3, 2002, the trial court, upon stipulation of the parties, ordered that the issue of punitive damages would not be tried and that punitive damages would not be awarded to the plaintiffs.

*375
Original Judgment

Following jury trial on the merits, the trial court rendered judgment as follows:
1. In favor of plaintiff, Michelle Crutchfield, and against Holiday Inn and Ace for wrongful death of her spouse, Samuel Crutchfield in the amount of $1,000,000.00;
2. In favor of plaintiff, Michelle Crutchfield, and against Holiday Inn and Ace for loss of consortium in the amount of $25,000.00;
3. In favor of plaintiff, Michelle Crutchfield, on behalf of the estate of Samuel Crutchfield, and against Holiday Inn and Ace for pain and suffering in the amount of $100,000.00;
| ,¡4. In favor of plaintiff, Michelle Crutchfield, on behalf of the estate of Samuel Crutchfield, and against Holiday Inn and Ace for pre-impact fear in the amount of $200,000.00;
5. In favor of plaintiff, Michelle Crutchfield, on behalf of the estate of Samuel Crutchfield, and against Holiday Inn and Ace for funeral expenses in the amount of $7,000.00;
6. In favor of plaintiff, Michelle Crutchfield, on behalf of the estate of Samuel Crutchfield, and against Holiday Inn and Ace for loss of support in the amount of $637,253.00;
7. In favor of plaintiff, Michelle Crutchfield, as natural tutrix and legal guardian of Samantha, and against Holiday Inn and Ace for the wrongful death of a parent in the amount of $500,000.00;
8. In favor of plaintiff, Michelle Crutchfield, as natural tutrix and legal guardian of Samantha, and against Holiday Inn and Ace for loss of consortium in the amount of $500,000.00;
9. In favor of plaintiff Aaron Thomas Dread and against Holiday Inn and Ace for the wrongful death of a parent in the amount of $500,000.00;
10. In favor of plaintiff Aaron Thomas Dread and against Holiday Inn and Ace for loss of consortium in the amount of $500,000.00;
11. In favor of plaintiff, Shirley Biratu, as natural tutrix and legal guardian of Samuel L. Crutchfield and against Holiday Inn and Ace for the wrongful death of a parent in the amount of $500,000.00;
12. In favor of plaintiff, Shirley Biratu, as natural tutrix and legal guardian of Samuel L. Crutchfield and against Holiday Inn and Ace for loss of consortium in the amount of $500,000.00;
1713. In favor of plaintiff, Shirley Bira-tu, as natural tutrix and legal guardian of KeShana L. Crutchfield and against Holiday Inn and Ace for the wrongful death of a parent in the amount of $500,000.00;
14. In favor of plaintiff, Shirley Biratu, as natural tutrix and legal guardian of KeShana L. Crutchfield and against Holiday Inn and Ace for loss of consortium in the amount of $500,000.00.
The jury apportioned fault to Derek Landry (30%), to Holiday Inn (40%) and to street liquor vendors (30%). The judgment awarded legal interest from the date of judicial demand with all costs and expert fees taxed to the defendants.
According to the Jury Interrogatories, the jury found as follows:
1. Holiday Inn served alcohol to Derek Landry.
2. The alcohol was a legal cause of the accident involving Samuel Crutchfield.
3. Derek Landry was negligent with regard to the accident.
4. Derek Landry’s negligence was a legal cause of the accident.
*376 5. The street vendors were negligent with regard to the accident.
6. The street vendors’ negligence was a legal cause of the accident.
On September 27, 2002, Ms. Biratu and Ms. Crutchfield filed a petition to settle their minor children’s claims against Rin-gler Associates Boston, Inc. and its representative Lawrence Cohen. Plaintiffs allegedly engaged with Ringler and Cohen to structure their insurance settlement funds, resulting in litigation in federal court against Cohen, Ringler and AIG Life Insurance Company. Plaintiffs sought court approval of a settlement with these defendants for the benefit of plaintiffs and their minor children and Aaron Thomas Dread in the amount of $750,000.00. The | strial court approved the petition by judgments dated September 27, 2002 and October 10, 2002.
On October 8, 2002, Ace filed a motion for new trial and/or remittitur and/or judgment notwithstanding the verdict. On October 9, 2002, Civic Center Site Development Co., Inc., d/b/a Holiday Inn Downtown Superdome and GAN National Insurance Company filed a motion for judgment notwithstanding the verdict and in the alternative for new trial.
By judgment dated February 26, 2003, the trial court denied the motions for judgment notwithstanding the verdict and granted the motion for new trial only insofar as it corrected the names of the defendants and made appropriate reductions for apportionment of fault.

Amended Judgment

On March 13, 2003, the trial court amended the judgment as follows:
1. In favor of Michelle Crutchfield and against GAN National Insurance Company, Civic Center Site Development Co., Inc. d/b/a/ Holiday Inn Downtown Super-dome and Ace American Insurance Company f/k/a CIGNA Insurance Company: $400,000 for wrongful death of spouse and $10,000 for loss of consortium;
2. In favor of Michelle Crutchfield on behalf of the estate of Samuel Crutchfield and against GAN National Insurance Company, Civic Center Site Development Co., Inc. d/b/a Holiday Inn Downtown Super-dome and Ace American Insurance Company f/k/a CIGNA Insurance Company: $40,000 for pain and suffering; $80,000 for pre-impact fear; $2,800 for funeral expenses; $254,901.20 ■ for loss of support;
lii3. In favor of Michelle Crutchfield as natural tutrix and legal guardian of Samantha Crutchfield and against GAN National Insurance Company, Civic Center Site Development Co., Inc. d/b/a Holiday Inn Downtown Superdome and Ace American Insurance Company, fik/a CIGNA Insurance Company: $200,000 for wrongful death of parent and $200,000 for loss of consortium;
4. In favor of Aaron Thomas Dread and against GAN National Insurance Company, Civic Center Site Development Co., Inc. d/b/a Holiday Inn Downtown Super-dome and Ace American Insurance Company, f/k/a CIGNA Insurance Company: $200,000 for wrongful death of parent and $200,000 for loss of consortium;
5. In favor of Shirley Biratu, as natural tutrix and legal guardian of Samuel L. Crutchfield and against GAN National Insurance Company, Civic Center Site Development Co., Inc. d/b/a Holiday Inn Downtown Superdome and Ace American Insurance Company f/k/a CIGNA Insurance Company: $200,000 for wrongful death of Parent and $200,000 for loss of Consortium;
6. In favor of Shirley Biratu as natural tutrix and legal guardian of KeShana L. Crutchfield and against GAN National Insurance Company, Civic Center Site De *377 velopment Co., Inc. d/b/a Holiday Inn Downtown Superdome and Ace American Insurance Company f/k/a CIGNA Insurance Company: $200,000 for wrongful death of parent and $200,000 for loss of consortium, all with interest from the date of judicial demand and costs and expert fees taxed to the defendants.
From that judgment Civic Center Site Development Company, Inc. d/b/a Holiday Inn Downtown Superdome, GAN National Insurance Company and Ace American Insurance Company took a suspensive appeal on March 18, 2003. The trial court entered an order for suspensive appeal on March 18, 2003.
l1ftAt issue on appeal is whether the Holiday Inn was legally at fault for serving alcohol to Derek Landry and for causing the fatal injury to Mr. Crutchfield.

Statement of Facts Concerning Liability

Sergeant Emile Sanchez, a twenty-seven year veteran law enforcement officer, testified that he was a member of the Kenner Police Department, holding a Bachelor’s degree in law enforcement from Loyola University of the South at the time of the accident. He testified that he had taken over sixteen courses in accident investigation and reconstruction and attended a twenty-four hour school on DWI detection through standardized field sobriety administration. Officer Sanchez is also an instructor in DWI and field sobriety administration. The parties stipulated to his expertise in accident reconstruction and DWI detection.
On the date of the accident, Officer Sanchez was a patrolman assigned to the Ken-ner Police Department’s Traffic Division. While off duty and on his way to the gym, he had his police radio turned on and heard a call at approximately 9:22 a.m. about an accident off 1-10 East at the Loyola exit. He arrived at the scene at about 9:27 a.m. and began his investigation. He identified a photograph of the accident scene, and noted that when he arrived, the victim had obvious signs of trauma including the loss of a leg. The officer checked the victim and found no vital signs. He then identified the vehicles involved and the drivers, did an overview of the scene and secured the scene to prevent the loss of physical evidence. He took statements from the witnesses and took measurements.
As a result of his investigation, Office Sanchez determined that the tractor-trailer was parked as shown on the photograph of the accident scene, off the thoroughfare and on the side of the highway. Mr. Crutchfield was the truck driver, and was out of the vehicle on its left side, between the truck and highway traffic. | nApparently, he was either checking or re-securing his load, at which time a Ford pickup truck left the travel lane of the roadway, struck the left rear corner of the trailer, continued down the side of the vehicle striking Mr. Crutchfield. The pickup truck then continued across the front of the Crutchfield truck off the road across the exit ramp to Loyola Drive striking another vehicle. Both the pickup truck and the other vehicle continued off the ramp coming to rest on top of a fence. Witnesses Lynne Triche and her son, Jeremy Vicknair, advised Officer Sanchez that the pickup was traveling between 60 and 80 miles per hour.
Officer Sanchez identified the driver of the pickup truck as Derek Landry.
Officer Sanchez looked for pre-impact skid marks and found none. Therefore, if Derek Landry had applied his brakes, they were not applied with sufficient force to cause the wheels to lock. Based on a witness’s statement, Officer Sanchez concluded that Landry had come from either the inside lane closest to the median or the *378 lane adjacent to that into the strike area, crossing at least one lane. Officer Sanchez testified that although Landry told him his vehicle was struck from the rear, his inspection of the pickup truck revealed no fresh damage and no indication that the vehicle had recently been struck to cause it to leave its lane. Officer Sanchez concluded that the sole fault or cause of the accident was Derek Landry’s actions.
When he talked to Landry, Officer Sanchez smelled alcohol on the youth’s breath. He asked Landry where he was going at the time of the accident and Landry told him he was traveling from New Orleans to Hammond, although in fact Landry was traveling eastbound back towards New Orleans. Officer Sanchez performed a standardized field sobriety test composed of three components. The first component was the Horizontal Gaze Nystagmus test in which the individual h ¿follows an object and the examiner looks for an involuntary jerking in the eyes. In the second component, the subject was called on to perform a walk-and-turn test consisting of walking nine heel-to-toe steps down a line, turning around in the prescribed manner, and returning nine steps back down the line. The third component was the one-leg stand, where the subject stands on one foot, holding the other foot six inches off the ground counting out loud from 1001 for a period of thirty seconds. Officer Sanchez administered this test to Landry who performed poorly on the Horizontal Gaze Nystagmus and Walk-and-Turn, but was able to perform the one-leg stand as instructed.
Based on the circumstances of the accident and Landry’s apparent intoxication, Officer Sanchez placed Landry under arrest and transported him to the Kenner lockup where he was administered an In-toxilyzer test at 10:59 a.m. that registered .138 blood alcohol level, well over the statutory limit of .020 for persons under the age of 21. Landry was seventeen. He was charged with the crime of Vehicular Homicide, for which Driving While Intoxicated is a lesser and included offense. At the time of the Intoxilyzer test, Derek Landry was read his Miranda rights, and he gave Officer Sanchez a statement that he, his twin and their friend were walking down the street in New Orleans and somebody was selling beer on the side of the road and sold them some beer. He said nothing about where he had consumed alcohol prior to that.
As a result of his intoxication level, Landry’s reaction time, muscle control and coordination were impaired and his central nervous system was depressed. Based on his examination, Officer Sanchez concluded that alcohol was certainly a factor in the accident and that Mr. Crutchfield was without fault.
| ^Officer Sanchez testified that he questioned Derek Landry who told him he had left Hammond for New Orleans at approximately 10:30 to 11:00 the night before. He questioned Derek’s twin brother, Eric Landry, who said they had gone to the big Holiday Inn “with the big clarinet.” On cross-examination, Officer Sanchez agreed that Eric Landry did not say they had been drinking at the Holiday Inn, but that when asked where they had been in New Orleans, all Eric could advise was “by the big Holiday Inn with the big clarinet by Loyola,” by it, not in it. Neither Eric Landry, Derek Landry, nor their friend, Eric Sziber said that they had alcoholic beverages in the Holiday Inn. Rather, they said they had purchased beers on the street. Sziber told Officer Sanchez in his statement that they had been on Bourbon Street. On re-direct examination, Officer Sanchez testified he did not recall asking the Landrys or Sziber if they had been drinking at the Holiday Inn.
*379 Derek Landry[1] testified that on February 20, 1998, he, his twin brother and Eric Sziber left Hammond at 10:00 or 10:30 p.m. to travel to New Orleans. Before leaving Hammond, he had nothing to eat or drink, and had about forty or fifty dollars to spend in New Orleans. On cross-examination, Derek was questioned about his deposition at which he testified that he left Hammond from the Sziber house “around dark” in February. Upon arriving in New Orleans, he parked under the big clarinet on the side of the parking lot and went directly from his car into the Holiday Inn. He ordered approximately three drinks from the Holiday Inn bartender, whom he described as a white male with short hair. When he left the Holiday Inn, Derek felt drunk and knew he shouldn’t drive, intending to “walk off’ 114the liquor before returning to Hammond. On cross-examination, he testified that he got lost while looking for his vehicle, and walked around until daylight. He found the big clarinet on the side of the hotel and found his vehicle. He testified that he was served three bourbon and Coca-Colas where he was parked. When asked specifically if he was sure that it was at the Holiday Inn, he replied, “I’m not one hundred percent sure, but where we parked we walked right not even a block.... We walked toward the road and then up the street.” Derek could not recall anything about the bar except that it was crowded. He had to walk down a little alley or aisle before getting into the bar. He did not recall going into a hotel lobby, but was not paying attention. He testified, “It seems like I remember seeing a pool table.” At his deposition, Derek testified as follows:
Q: What did you do while you were in — in—did you do anything while you were in the bar besides drink?
A: Shoot a game of pool.
Q: So the bar had a pool table in it?
A: Yeah.
Q: Did it have one pool table, two pool tables, do you remember?
A: I don’t recall. It may have had two.
Q: Derek, are you positive you played a game of pool in this bar?
A: Yes sir.
On re-direct examination, Derek testified that it just seemed like he remembered seeing a pool table, although he did not recall having shot a game, and that “at some point that night” he saw a pool table.
After leaving the Holiday Inn, he had approximately two or three beers. The following morning, he stopped at McDonald’s restaurant in Slidell for breakfast. _JjjHe testified on cross-examination that he got turned around in Slidell and headed back toward New Orleans. He could not tell what happened in the accident because he had fallen asleep, blacked out, passed out “or something.”
In November 1998, Derek signed an affidavit saying that on the evening of February 20 and the morning of February 21, 1998, he was in the lobby lounge of the Holiday Inn located at 330 Loyola Avenue in New Orleans where he was sold alcoholic beverages. Derek testified he was quite sure this statement was correct. On cross-examination, Derek testified that he signed the statement after having pled guilty to vehicular homicide but prior to his sentencing. His criminal defense attorney prepared the affidavit for him to *380 sign it. The defense attorney also appeared as notary on the affidavit.
On cross-examination, Derek testified that he drank beer once a week or occasionally for maybe a year before the accident. He knew not to drive when he had been drinking. He was not familiar with downtown New Orleans and did not know where he got the “beers on the side of the road” that he told the police he had had the night before the accident. He believed but was not certain that he had gone to Bourbon Street that night. He drank approximately two or three beers that night, all from street vendors, one of them a 40-ounce and one a 22-ounce beer. In his deposition, he had admitted having drunk two 40-ounce beers and up to 3 or four others in plastic cups. He testified that he never had drunk that much beer before.
Dr. Gerald Liuzza, stipulated to be an expert in forensic pathology with a special expertise related to alcohol and its effects on the body, testified that he reviewed the police accident report; depositions of Eric and Derek Landry taken in March 1999; Derek Landry’s deposition taken a week before trial; Dr. William J. George’s deposition, affidavit and report; the deposition of Holiday Inn General Manager 11fiWilliam Van Deventer; exhibits; results of the field sobriety and breathalyzer tests; and Mr. Crutchfield’s autopsy report. Based on that information, Dr. Liuzza concluded that Derek was intoxicated when he left the Holiday Inn. Accepting Derek’s testimony that he was served three drinks containing a minimum of one and one quarter ounces of alcohol each in one hour prior to leaving the Holiday Inn, Derek would have had a blood alcohol level of about .1025, approximately five times the legal limit for an underage drinker. If the drinks were one and one-half ounces, his blood alcohol level would have been about .120. In either case, there would be significant impairment, a deleterious effect on three main functions: (1) the ability to perceive, sense or feel, ie., the ability to have sensation; (2) the ability to move; and (3) the ability to have higher level brain functions such as thought and judgment.
Dr. Liuzza opined that the more people drink, the more that they are unable to keep track of how much they drink. The more they drink, the more they seem to think they are doing well when in fact they are getting worse. Dr. Liuzza testified that for reasons that are unclear, teenagers and young adults who reach a given blood alcohol level tend to exhibit a greater degree of impairment. He concluded that the three drinks at the Holiday Inn were a substantial contributing factor to the accident.
Dr. Liuzza also noted that when a person consumes alcoholic beverages so close together that one round of drinking occurs before the alcohol from the previous round has cleared the system, there will be a mixing of all the alcohol, so that it is conceivable that some of the alcohol to which the person was first exposed could still be active in his system at a later time. Assuming there was more or less continual drinking as opposed to completely separated periods of drinking, there |17would still be some alcohol from the initial round of drinking left in Derek Landry’s system at 9:20 the next morning. Dr. Liuzza further testified that falling asleep and blacking out are normal effects of alcohol. Alcohol is a drug of the sedative hypnotic class. It is a relaxant and sleep inducer.
On cross-examination, Dr. Liuzza testified that Derek would have had more alcohol in his system at the time of the accident than when the breath test was conducted, and estimated the blood alcohol level at the time of the accident to have been probably .160. Dr. Liuzza ad *381 mitted that he had no independent information that Derek had in fact been served any drinks at Holiday Inn the night before the accident. He testified that if Derek had had no alcohol after the three bourbon and Coca Colas, he would have essentially eliminated all the alcohol from his body by the time of the accident. Had he drunk only the two 40 ounce and three or four 22-ounce beers between midnight and 7:30 in the morning, his blood alcohol level at the time of the accident would have been more than .16.
Dr. Liuzza testified that even if Derek had ingested no beer after the three or four whiskey drinks, he would still have residual effects at the time of the accident. Dr. Liuzza pointed out that it has been shown that the effects of ethanol, especially in significant levels, persist for some hours after the alcohol is no longer measurable in the blood. Given the levels with which we are dealing in this case, Dr. Liuzza opined that the alcohol would have been eliminated relatively soon before the crash. Dr. Liuzza related that under those circumstances, there is a very good chance that there would still be some impairment from the alcohol left from an impaired affect, although the alcohol per se would no longer be present. In addition, there is a fatigue factor; alcohol puts a person to sleep. If a person has |1sbeen awake for a long time and has ingested alcohol, the effects are that much greater.
Finally, Dr. Liuzza stated that it is necessary to consider the negative effect of Derek’s age. Young people seem to show a greater degree of impairment for a particular blood alcohol concentration. Therefore, even though the blood alcohol level might be very low or even non-detectable, a very young person might have a greater degree of impairment than would an older adult. Thus, even if Derek had stopped drinking after having left the bar, and the high blood alcohol levels had been virtually eliminated, the effects from the original drinking could still have been a substantial contributing cause to the accident. Dr. Liuzza noted that impairment from the drinking encompasses impairment of judgment, including the judgment of when to stop drinking.
William J. George, Ph.D., a toxicologist and pharmacologist employed by the Tulane University School of Medicine, was accepted as an expert toxicologist and pharmacologist who could testify concerning the effects of alcohol. He reviewed the depositions of Derek and Eric Landry, Eric Sziber, Dr. Gerald Liuzza, Kenner police reports, the accident report, voluntary statements of the Landrys, Sziber, Lynne Triche and Jeremy Vicknair, affidavits of Derek and Eric Landry, and primary literature dealing with the pharmacology and toxicology of alcohol including the pharmacokinetics of alcohol.
He calculated the blood alcohol level at the time of the accident at .168 gram percent, which is .168 relative to a .1 gram percent, which would be the DWI level in Louisiana. He testified that the disparity between this and Dr. Liuzza’s estimate of .160 is not a major disagreement, and that Dr. Liuzza used a 15 milligram |iapercent for the rate of elimination, which is an older standard, and he used the average of 15 to 20, which is seventeen and one-half.
In Dr. George’s opinion, if Derek Landry had had three bourbon and Coca-Colas at a bar some time before midnight the night before the accident, his blood alcohol level at 9:22 the next morning would have been zero or very close to zero. Dr. George found that because Landry’s breath test reflected a blood alcohol of .138 (or .168 at the time of the accident), he would have to have ingested about thirteen drinks, or an additional ten 12-ounce *382 drinks, by midnight. Dr. George noted that exercise or the lack thereof has no effect on alcohol elimination, so that walking around would not have affected elimination rates. However, the fatigue factor associated with being awake all night was evident.
The parties stipulated that a bar is located on the first block of Carondelet Street off of Canal Street called the Hobnobber, which was in existence in February 1998, and which had a pool table.
Jo Ann Leigh, Holiday Inn’s Controller, testified that she has worked there for twelve years. If a guest arrived at the Inn, they would enter through a driveway connected to the hotel lobby. The guest would pass the check-in desk and go down the hallway to the lounge. She identified Steve Langr as a hotel bartender. At the time in question, bartenders were required to ring up each sale after it was served to the customer to make sure every sale was rung up and the money placed into the cash drawer. The hotel also required that bartenders use jiggers instead of free pouring alcohol. Several times throughout the year, Ms. Leigh has spotters come into the hotel to shop the lounge and order mixed drinks, paying with cash, to make sure that the bartender actually rang up the drinks and used a jigger. This is common practice in the hotel industry.
12nOnce a month Ms. Leigh and her assistant controller would audit the bartenders’ “banks” and count their cash to make sure that the cash was correct. She also audited tickets once a month to make sure nothing looked out of the ordinary and to make sure all the checks were closed out. The hotel also has an income auditor who audits income every night and compares actual cash deposits dropped off for the night with their cash reading. Ms. Leigh never suspected Langr of pocketing money.
Ms. Leigh reviewed the receipts for the night of February 20, 1998, and provided a compilation for the court. According to the records, the last ticket, for a glass of wine, was rung up at 12:28 on the morning of February 21, 1998. The prior ticket was rung up at 12:14 for a charge to a room guest. At 12:01 there were five calls for mixed drinks and a draft beer. Just before midnight there was an order for one beer. The next previous ticket, again just before midnight, was for thirteen beers and two Mardi Gras mixed drinks. There was no evidence of an order for three bourbon and Coca-Colas.
Ms. Leigh testified to Holiday Inn’s strict policy against serving minors. A bartender caught serving a minor was fired immediately. The policy has been in effect for at least the twelve years that Ms. Leigh has worked at the hotel.
On cross-examination, Ms. Leigh identified a report made by Julie Marshall, Director of Food and Beverage for the Holiday Inn. According to the report:
I, Julie Marshall, entered the Mardi Gras lounge to be a spotter checking on the service and integrity of the operation. At 6:05 p.m., March 23rd, 1998, I noticed that the bartender, Steve, was not ringing his cash sales. Instead he would take a piece of scratch paper from under the phone and note his sales then placing his tally back under the phone. He was very cautious and aware of who was in the room when making his notations. I l^know that this method is most frequently used to pocket cash sales. Sincerely, Julie Marshall.
Ms. Leigh also admitted that the hotel had reprimanded Mr. Langr on July 31, 1998 for free-pouring alcohol in drinks. Mr. Langr was also reprimanded at the same time for having had his feet on the bar watching and ignoring guests. Ms. *383 Leigh was shown the drink register for the night before the accident and noted intervals of sixteen minutes, eleven minutes, eight minutes, seven minutes, eight minutes, twelve minutes and nineteen minutes between drinks on the Friday night before Mardi Gras. The plaintiffs claim that the jury could conclude reasonably that Mr. Langr did not ring up all his drink orders.
Nancy Vita testified that she was Director of Food and Beverage at the Holiday Inn from 1997 to March 1999. As such, she trained bartenders and helped to formulate some of the Inn’s procedures. She had approximately sixty employees under her supervision including Mr. Langr. Overall, he was a good bartender who knew how to mix drinks and knew basic company standards and principles although he was “a little bit sloppier than” she would have preferred. She testified that most of the bar’s patrons were about forty years old, and that the bar did not get many young patrons. A minor would look out of place at the Inn’s bar. According to Ms. Vita, the penalty for serving a minor was immediate termination; the penalty for free pouring liquor would be to be written up, but not fired. The Inn’s policy is that no one under twenty-one years of age is to receive alcohol by gift or purchase.
According to Ms. Vita, Mr. Langr was never caught pocketing money. He did not wipe things down correctly with bleach solutions and left things sticky, and did not rotate the shelves the way he was supposed to. His one big problem wasj^that he used to get very busy and would leave his cash drawer wide open, working out of his cash drawer. He was written up for this infraction.
Ms. Vita was familiar with Ms. Marshall’s report. She spoke to Mr. Langr about the report and he told her he was working with a large group that did not have a credit card, so he kept a written tally of their drinks.
Ms. Vita testified that she was working at the Inn on February 20, 1998 and never saw Mr. Landry in the Inn’s bar.
Holiday Inn General Manager William VanDeventer testified that the Inn’s policy prohibits sale of alcohol to minors. Upon proof of sale to a minor, a bartender will be terminated. He has never seen any Holiday Inn bartender sell alcohol to a minor.
Steve Langr testified that he began working at the Holiday Inn in 1991. He had attended and passed the course at Maryland School of Bartending in Glen Berry, Maryland. He received additional training at Holiday Inn concerning their policies, in connection with which he received a book containing the Inn’s rules and regulations. According to these policies, he could not serve persons under the age of twenty-one or persons who appeared to be intoxicated. If Derek Landry had come into the bar, Mr. Langr testified he would not have served him alcohol or allowed him into the bar without his parents, because he was obviously under legal age. The procedure would be to ask for identification and, if the identification did not show the patron was of legal age, he would not serve him. He specifically denied having served Derek or Eric Landry or Eric Sziber on the night of February 20,1998.
laMr. Langr testified that at no time did the Holiday Inn have a pool table. There was a pool table at the Comfort Inn across Loyola Avenue from the Holiday Inn. Nei-man’s, a sports bar in the area, also had a pool table.
He identified the drink register from the evening of February 20, 1998, and testified that there was only a moderate crowd that evening, and that he was not stressed. He *384 closed at 12:38 a.m. because there was no business and in his experience after a certain point the patrons are rowdy and overly intoxicated. The bar is essentially for hotel guests rather than patrons coming in off the street to party.
In 1998, he was terminated because of a disagreement with management over food and guest service.
Kevin Lee testified that he worked for the Holiday Inn for two years, from September of 1997 to 2000, as a food and beverage manager. One of his employees was Steve Langr. According to Mr. Lee, Mr. Langr showed up for work on time, followed the rules and regulations, took care of the bar and was “a number one guy.” He never saw Mr. Langr pocket money or sell alcohol to minors. Holiday Inn’s policy was not to serve liquor to minors. He confirmed earlier testimony that the bar patrons were mostly hotel guests and Poydras Street workers. Hotel employees were trained to ask for identification prior to selling alcohol to someone who might not be of legal age. Mr. Lee testified that the policy was enforced. He also confirmed that the Holiday Inn bar did not contain a pool table, but was unaware of any other bars in the neighborhood that did.

J^Statement of Facts Concerning Damages

Aaron Thomas Dread[2] testified that he is nineteen years old and lives in Engle-wood, California with his mother, Kathey Dread. His father was the decedent, Samuel Crutchfield. Aaron is a full-time student at El Camino College in general studies. He last saw his father a few weeks prior to the accident. His mother had contacted Michelle Crutchfield because Ms. Dread thought it would be “cool” if Aaron got to meet his father. Prior to that time, he had no relationship with his father. Aaron, Ms. Dread and Mr. Crutchfield went to the Sizzler for dinner, and they talked about establishing a stronger relationship between Aaron and his father. The specific plan was for Aaron to go with Mr. Crutchfield to his family reunion in Georgia that coming summer. Aaron testified that he loved his father and that at the dinner he believed he was coming back into his life as a stronger force.
On cross-examination, Aaron testified that Mr. Crutchfield left Ms. Dread and Aaron when Aaron was three or four years old and had no contact or relationship with Aaron until or after the dinner at the Sizzler. Aaron admitted that he has not visited his father’s gravesite and did not attend his funeral. Aaron has not inquired about the location of his father’s gravesite. Mr. Crutchfield provided no financial support to Aaron.
Shirley Biratu testified that she and her children live in California. She and Mr. Crutchfield were married in 1986, had two children, KeShana, who was 15 years old at the time of trial, and Samuel, who was 13. The Crutchfields divorced five years after their wedding. During the marriage, Mr. Crutchfield was a caring | ¡^and loving father and supported the family financially. Once divorced, Mr. Crutchfield provided only sporadic support to the children. Ms. Biratu learned of Mr. Crutchfield’s death from Ms. Dread. Sam and KeShana tell their mother that they miss their father all the time. The children had not seen their father the previous Christmas or Thanksgiving. Mr. Crutchfield did not celebrate these holidays because of his re *385 ligious beliefs as a Jehovah’s Witness. Neither Ms. Biratu nor the children attended Mr. Crutchfield’s funeral in California or visited his gravesite.
Michelle Crutchfield testified that she and the decedent were married in June 1996 in Los Angeles and were married at the time of his death. At the time of the accident, Mrs. Crutchfield was pregnant with their only child, Samantha. She and her older children would often travel in his truck with Mr. Crutchfield, and she spoke with him every day whether he was home or at work. They went to movies and to the beach. She described Mr. Crutchfield as a loving, hard-working and caring husband.
Dr. Randy Rice was stipulated to be an expert economist. He performed calculations on the amount of income Mr. Crutch-field would have earned had he lived out his normal work life expectancy, based on his actual past earnings. According to the Bureau of Labor statistics and Mr. Crutch-field’s educational level, expected income growth, inflation and work experience, Dr. Rice opined he would have had an additional work life of 19.61 years and would have earned $748,000.00 with a present value of $588,650.00. Dr. Rice testified that the calculated loss of support to his family was $637,253.00.
| Standard of Review
Appellate courts have a constitutional duty to review both fact and law. See, Cole v. State, Dept. of Public Safety and Corrections, 2001-2123 (La.9/4/02), 825 So.2d 1134.
On review by the state appellate court, the manifestly erroneous or clearly wrong standard applies to the factual findings of the district court. Bibbins v. City of New Orleans, 2002-1510 (La.App. 4 Cir. 5/21/03), 848 So.2d 686, unit denied 2003-1802 (La.10/10/03), 855 So.2d 357. Where there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). WOiere there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. Virgil v. American Guarantee & Liability Ins. Co., 507 So.2d 825 (La.1987). The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder’s conclusion was a reasonable one. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990).
Appellate review of questions of law is simply a review of whether the trial court was legally correct or legally incorrect. O’Niell v. Louisiana Power & Light Co., 558 So.2d 1235, 1238 (La.App. 1 Cir.1990). W/here the facts are not in dispute, the reviewing court must consider whether the trial court came to the proper legal determination under the undisputed facts. La. C.C.P. art. 2164; Maryland Cas. Co. v. Dixie Ins. Co., 622 So.2d 698 (La.App. 1 Cir.1993), unit denied 629 So.2d 1138 (La.1993); Mattery v. International Harvester Co., 14,823, 96-321 (La.App. 3 Cir. 11/6/96), 690 So.2d 765, writ denied, 97-1323 (La.9/5/97), 700 So.2d 512.

127Claims on Appeal

On appeal Holiday Inn contends that the trial court erred in: (1) finding that the Holiday Inn served alcoholic beverages to the defendant, Derek Landry, on the night before the accident; (2) finding that if the Holiday Inn served liquor to Derek Landry, this was a cause of the accident that occurred at 9:22 a.m. the next day; (3) assessing 40 percent of the liability to the Holiday Inn; (4) assessing excessive damage awards; (5) taxing all costs against the Holiday Inn; and (5) failing to find that *386 the Holiday Inn was prejudiced by the plaintiffs’ closing remarks at trial.

Claim that the Holiday Inn Served Alcohol to Derek Landry Sufficiency of Evidence/ Duty Risk Analysis

The Holiday Inn argues that the jury erred in finding that the Holiday Inn served alcohol to Derek Landry when: (a) the only supporting evidence was Landry’s conflicting testimony that he was served three drinks at the Holiday Inn bar where he was playing pool; (b) it was undisputed that the Holiday Inn bar did not and could not contain a pool table; and (c) Landry’s testimony was inconsistent with the objective and testimonial evidence adduced at trial.
The sufficiency of the evidence is a question of law. Roberson v. August, 2001-1055 (La.App. 4 Cir. 5/29/02), 820 So.2d 620.
In Berg v. Zummo, 786 so.2d 708 (La.2001), the Louisiana Supreme Court provided a duty/risk analysis to a case that presented the question of whether a bar may be liable for serving alcohol to a minor who then caused injury to the plaintiff.
In Berg, the pedestrian brought an action against the driver, the driver’s friends, and a bar, The Boot, that sold alcohol to the minor Zummo, who with his companions, had an altercation with the plaintiff Berg just after leaving the bar. The plaintiff Berg claimed that as he approached the intersection of Audubon | ¡^Street and Zimple Street (down the block from The Boot), the defendant Zummo and his four companions, approached him, and, without warning, accosted and beat him. Zummo then got into his truck and hit Berg, causing him bodily injury.
In a decision with three dissents, the Louisiana Supreme Court reversed this Court’s prior opinion and found that the alcoholic beverage vendor, The Boot, was liable. Previously, this Court found that under the application of general negligence principles and the duty/risk analysis, the bar is not liable unless the plaintiff proves that the bar: (1) failed to exercise the care of a reasonable person under the circumstances, and (2) committed some “affirmative act” that “increased the peril” posed by the minor’s intoxication. However, the Louisiana Supreme Court reversed. It stated that:
The “affirmative act” requirement, specifically unreasonable ejectment from the premises, was put into place by this Court in Thrasher[ v. Leggett, 373 So.2d 494 (La.1979) ], as a requirement to impose liability on an alcoholic beverage vendor who serves alcohol to an intoxicated adult. However, the difference between selling and serving alcohol to an adult and a minor is tremendous. Legislation has been enacted specifically pertaining to the sale of alcohol to minors, (FN4 omitted) and although those statutes impose criminal, rather than civil, responsibility, they serve as guidelines for the determination of an alcoholic beverage vendor’s duty to refrain from selling or serving alcohol to minors. It further evidences the public policy of this state to prohibit the sale of alcohol to minors and to protect minors and the general public from the effects of a minor’s intoxication, particularly when the minor is operating an automobile. The court of appeal’s holding that serving alcohol to a minor is not an affirmative act which can result in liability would allow alcoholic beverage vendors throughout the state to sell and serve alcohol to minors in violation of state law without fear of civil liability and, thus, we reject that holding.
Id., 2000-1699, p. 11, 786 So.2d at 715.
The Supreme Court concluded that:
*387 1 ;>c|The liability of a vender of alcoholic beverages who sells or serves alcohol to a person under the legal drinking age is determined under La. C.C. arts. 2315 and 2316 using the traditional duty/risk analysis on a case by case basis. Under this analysis, the vendor has the duty to refrain from selling or serving alcohol to a minor, and if the other requirements of breach of duty, causation and damages are proven, the vendor will be liable for damages. It is not necessary that the vendor commit an additional “affirmative act,” such as ejecting the minor patron from the premises, that increases the peril of the intoxicated patron, in order for liability to be imposed. (Emphasis added.)
Id., 2000-1699, p. 15, 786 So.2d at 718.
In Colgate v. Mughal Bros., Inc., 36,754 (La.App. 2 Cir. 1/29/03), 836 So.2d 1229, the minor had been drinking at a nightclub, The Extremes, and then she went to other nightclubs. Several hours later she lost of control of her vehicle and died in a one-vehicle accident. Her mother brought a wrongful death action against the owner of The Extremes nightclub. The Second Circuit stated:
Brandi Spradlin (“Spradlin”) was twenty years old on the date of her death. Although Spradlin’s whereabouts for the entire evening preceding her death are not completely known, she did spend time at The Extremes nightclub, (FN2 omitted) where she allegedly drank alcoholic beverages. Spradlin also visited other nightclubs, where, again, she may or may not have consumed alcoholic beverages. At approximately 2:00 a.m., Spradlin left The Extremes. Several hours later, she lost control of her vehicle. The resultant collision left her with massive injuries which caused her death. Blood tests revealed that Spradlin had a blood alcohol concentration in excess of the presumptive limit for legal intoxication. (Emphasis added.)
Id., 36,754, p. 1, 836 So.2d at 1231.
The appellate court referred to Berg and noted that:
In determining whether liability exists, the court must determine whether the bar owner violated general negligence principles, applying the traditional duty/risk analysis. Id. In Berg, the court determined that the lanfollowing five separate elements must be proved: (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant failed to conform his conduct to the appropriate standard (the breach of duty element); (3) the defendant’s substandard conduct was a cause-in-fact of the plaintiffs injuries (the cause-in-fact element); (4) the defendant’s substandard conduct was a legal cause of the plaintiffs injuries (the scope of liability or scope of protection element); and, (5) actual damages (the damages element). Id. at 715-16, citing, Roberts v. Benoit, 605 So.2d 1032, 1051 (La.1991). A negative answer to any of the elements of the duty/risk analysis prompts a no-liability determination. Stroik v. Ponseti, 96-2897 (La.09/09/97), 699 So.2d 1072, 1077.
The burden of proving negligence by a preponderance of the evidence rests on the party alleging it. Aetna Life and Cas. Co. v. Solloway, 25,462 (La.App.2d Cir.01/19/94), 630 So.2d 1353, writ denied, 94-0575 (La.04/22/94), 637 So.2d 162. The plaintiff bears the burden of proving his case by a preponderance of the evidence. Id. Proof by direct or circumstantial evidence is sufficient to constitute a preponderance of the evidence when, taken as a whole, such proof shows that the fact sought to be *388 proved is more probable than not. Aetna Life and Cas. Co., supra, citing, Boudreaux v. American Ins. Co., 262 La. 721, 264 So.2d 621, 627 (1972). Here, in considering the facts of this case and applying the elements of the duty/risk analysis, we determine that Colgate failed to prove by a preponderance of the evidence that Mughal acted negligently.
The Louisiana Supreme Court determined that a vendor of alcoholic beverages has a duty to refrain from selling or serving alcohol to minors, noting that such activity is illegal. Berg, 786 So.2d at 716. Thus, we recognize the duty imposed on Mughal not to sell or serve alcohol to patrons under age twenty-one, such as Spradlin.
Once the duty is established, it is then incumbent upon the plaintiff to prove by a preponderance of the evidence that the stated duty was breached by the vendor. Whereas, in Berg, there was direct evidence that a minor had purchased alcohol at the bar in question, proving the breach, the evidence in this case does not so obviously lead to the conclusion that Mughal breached his duty to Sprad-lin.
In this case, the only evidence bearing on the issue of whether Spradlin was sold or served alcohol by [31 employees at The Extremes is entirely speculative. Probabilities, surmises, speculations, and conjectures are insufficient to prove negligence by a preponderance of the evidence. Cangiano v. Forte Hotels, Inc., 2000-40 (La.App. 5th Cir.10/31/00), 772 So.2d 879, 881, writ denied, 2000-3254 (La.01/26/01), 782 So.2d 636; Leger v. Citron Ford, Inc., 589 So.2d 23 (La.App. 1st Cir.1991).
The only evidence before the trial court bearing directly on this issue was through the testimony of Sandage. He testified he observed Spradlin take two glasses of beer from the main bar counter but that he saw no money exchange hands. Neither did he state that a bartender had handed Spradlin, i.e., “served,” the drinks. This evidence on the critical issue of whether Spradlin was sold or served alcohol by The Extremes is inadequate to conclude that Mughal breached his duty to Spradlin, because it requires further speculation by the fact finder as to how Spradlin obtained the drinks Sandage described. Given only Sandage’s testimony, the trial court, in reaching its judgment, had to surmise that a bartender at The Extremes sold or served Spradlin alcohol; however, other scenarios exist that are as plausible. For example, it is just as possible that someone of legal drinking age purchased the drinks for Spradlin or that she had fraudulently obtained a bracelet with a false identification card. There is no evidence to rule out such possibilities, which are also speculative, but no more so than the claim that she was sold or served alcohol by the bartenders at The Extremes.
As to the expert opinion of Bynum regarding Spradlin’s level of intoxication while she was at The Extremes, even if accepted, his opinion only proves that she was intoxicated during the time. It lends no support (without additional conjecture by the fact-finder) to the element of whether Mughal breached his duty to Spradlin or whether Spradlin consumed alcohol after leaving The Extremes. Again, to reach the conclusion that Mughal breached a duty to Spradlin would require speculation that Sprad-lin was intoxicated as a sole result of being sold or served alcohol by employees of The Extremes, of which there is no evidence. Thus, Colgate failed to meet her requisite burden of *389 proof. Such a finding pretermits a discussion of the remaining elements under the duty/risk analysis. (Emphasis added.)
Id., 36,745, pp. 6-8, 836 So.2d at 1233-1234.
[ 3?Upon review of the record in the present case, based not on a credibility determination (a factual issue), but on a sufficiency of evidence determination (a question of law), the plaintiffs failed to bear their burden of proof. See Roberson, id. In the present case, as in Colgate, it is just as possible that someone of legal drinking age purchased the drinks for Derek Landry or that he had a false identification card. There is no evidence to rule out such possibilities, which are also speculative, but no more so than the claim that he was sold or served alcohol by the bartender at The Holiday Inn.
It is even more speculative to assume that Derek Landry was served drinks by the bartender at the Holiday Inn in the present case in comparison to the speculation found in Colgate. According to a witness in Colgate, he saw the minor with drinks at The Extremes nightclub, but did not see if the minor was served or if she paid for the drinks. In the present case, Derek Landry remembered seeing the clarinet on the side of the building. The record does not show any of the circumstances as to when or how Landry obtained his drinks in the bar at the Holiday Inn. Landry’s memory was hazy where he stated that a pool table was in the bar. The Holiday Inn had no pool table. This results in speculation that does not show more probably than not if and how Landry was served alcohol at the Holiday Inn.
Further, the present case differs from Berg v. Zummo, supra. In Berg, the altercation and injury occurred immediately after the intoxicated defendant Zummo left The Boot. Zummo did not go drinking at other locations before the altercation and Berg’s injuries took place several hours later.
In Berg, the Louisiana Supreme Court noted that La. R.S. 9:2800.1, only provides immunity from liability arising from the service of alcohol to adults. 1¡^Although there may be a duty not to serve alcohol to minors, that duty does not extend to cover the risk of the fatal accident hours later after additional continued drinking by the minor in other locations in the present case. Even assuming that the Holiday Inn served alcoholic drinks to the minor, Derek Landry, before midnight on February 20,1998, Landry’s testimony shows that he continued to drink after leaving the Holiday Inn. The accident did not occur until approximately nine hours later.
If Derek Landry may have been served three bourbon and Cokes at the Holiday Inn several hours before the accident occurred at 9:22 a.m. the next day, it is clearly unreasonable to find that the ingestion of those three bourbon and Cokes was the cause-in-fact of the fatal accident. Landry would not have been intoxicated if he had nothing more to drink after he left the Holiday Inn. The Holiday Inn cannot be responsible for Derek Landry’s intoxication resulting from his binge-drinking during the rest of the night and the next morning.
Even if Derek Landry were served three drinks of bourbon and Coke at the Holiday Inn, we cannot find that the Holiday Inn had a legal duty to prevent the defendant Landry from drinking for the remainder of the night. Landry’s drinking at the Holiday Inn was not the legal cause of his condition when his vehicle struck the plaintiff on the road at 9:22 a.m. the next day. Assuming the above facts, just as in Colgate, the Holiday Inn could not have a legal duty where there was no evidence *390 that Derek Landry was intoxicated as a sole result of being sold or served alcohol by the bartender at the Holiday Inn. The risk that caused the fatal accident was not within the scope of the Holiday Inn’s duty. A finding of no legal duty pretermits a review of the remaining elements under the duty/risk analysis.
| ^Allocation of Fault
Considering that we find that the Holiday Inn was not at fault for the accident, we reverse the trial court’s finding of the percentages of fault. We find the allocation of 40 percent of fault to Holiday Inn and 60 percent equally divided between Derek Landry and the street vendors was clearly wrong. We assess 60 percent of fault to Derek Landry and 40 percent of fault to the street vendors.

Claim of Excessive Damages

A finding that the Holiday Inn is not at fault for the accident, pretermits a review of the Holiday Inn’s claim of excessive damages. The Holiday Inn is not assessed with any amount of the damage awards.

Costs

Because we find that the Holiday Inn is without fault, we reverse the trial court’s assessment of all court costs and fees against the Holiday Inn. We assess all court costs and fees equally against Derek Landry and the street vendors.

Plaintiffs’ Closing Remarks

The Holiday Inn’s argument concerning the prejudice of the plaintiffs’ closing remarks is not considered because the Holiday Inn is not at fault.
Accordingly, we reverse the trial court’s finding that the Holiday Inn was at fault for causing the accident. Therefore, the defendants/appellants, including Civic Center Site Development Company, Inc. d/b/a Holiday Inn Downtown Superdome, GAN National Insurance Company, and Ace America Insurance Company are not liable. The claims against the appellants are dismissed.
We amend the judgment to allocate 60 percent of fault to Derek Landry and 40 percent of fault to the street vendors. We reverse the trial court’s assessment of all court costs and fees against the Holiday Inn. We amend the judgment to |3Sallocate all costs and fees assessed equally against Derek Landry and the street vendors.

REVERSED IN PART AND AMENDED IN PART.

. The parties stipulated, and Derek Landry agreed, that he is entitled to a credit for the nearly $6,000,000.00 plaintiffs received from Mr. Crutchfield's employer's UM insurers, and that plaintiffs cannot exceed that amount in the collectible judgment against Mr. Landry, who was at the time of trial serving a sentence at hard labor on his vehicular homicide conviction.

. The parties stipulated that since Mr. Dread has attained the age of eighteen and has been added as a party plaintiff, Ms. Dread no longer has a claim in the case, and her claim was dismissed without objection.